**ELLICOTT MACHINE CORPORATION, INCORPORATED, Plaintiff–Appellant,**

**v.**

**JOHN HOLLAND PARTY LIMITED, Defendant–Appellee.**

No. 92–1522.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 1992.

Decided May 20, 1993.

John Peter Spyros Sarbanes, Venable, Baetjer & Howard, Baltimore, MD, argued (George F. Pappas, on brief), for plaintiff-appellant.

Francis Joseph Gorman, Semmes, Bowen & Semmes, Baltimore, MD, argued, for defendant-appellee.

Before NIEMEYER and HAMILTON, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

SPROUSE, Senior Circuit Judge:

We review the judgment of the United States District Court for the District of Maryland, which dismissed a United States corporation's declaratory judgment action against an Australian construction and engineering company, John Holland Pty Ltd. ("Holland"). The court ruled that due process constraints barred it from exercising personal jurisdiction over Holland under Maryland's long-arm statute. We affirm.

I

The plaintiff-appellant is Ellicott Machine Corporation, Inc. ("Ellicott"), a United States

manufacturer of sand dredges, headquartered in Baltimore. Ellicott's declaratory judgment action stemmed from a contract between it and Holland. The contract, which was performed in Australia, required Holland's assembly of a mining dredge shipped by Ellicott to an Australian customer, Minproc Engineers Pty Ltd. ("Minproc").

Minproc mines heavy mineral sand deposits in Cooljarloo Mineral Sands Project, fifteen kilometers northwest of Cataby, in Western Australia. After Minproc determined that a modern dredge would contribute to successful mining, it approached companies selling dredges. On October 18, 1988, Doug Piper, a vice president of Ellicott, travelled to Australia to meet with Minproc and to discuss Ellicott's bid on the project. The successful bidder would supply the component parts, but the dredge would be assembled at the mining site in Australia. At the meeting, representatives of Minproc encouraged Ellicott to subcontract with Holland for the assembly of the dredge. At that time, Holland owned 10% of Minproc's publicly traded stock. Shortly after the meeting, Holland and Ellicott met in Australia. During the meeting, Holland offered an informal bid, which Ellicott rejected as too high.

Minproc awarded Ellicott the general contract to furnish the dredge. The design and construction of the machinery were to be completed in the United States, the structural steel work in Singapore, and the automation by Ellicott's corporate partner in the Netherlands. All the components were to be shipped to Australia for field assembly at the site by a subcontractor. To this end, Ellicott invited a number of construction firms to submit final bids in May 1989. Although Holland was not among the invited companies, on May 11, 1989, it contacted Ellicott's corporate headquarters in Baltimore, faxing a request to bid on the assembly subcontract. After Ellicott received the fax, both Holland and Minproc pressed Ellicott to award the bid to Holland. When Holland submitted a price of $950,000, which was substantially less than it had previously offered, Ellicott accepted it as the low bid on June 28, 1989.

On July 11, 1989, Ellicott sent Holland a draft of a purchase order containing the terms of the subcontract. On August 1, 1989, after Holland sent Ellicott a modified order, Ellicott revised the terms again and sent them to Holland. With Ellicott's consent, Holland marked up the revised purchase order in Australia, signed it, and forwarded it to Ellicott. Ellicott then signed the order in Maryland. The revisions that the two companies made before they signed the final version of the subcontract were negotiated by letter, fax, and telephone between Holland's office in Australia and Ellicott's office in Maryland. The negotiations occurred over a period of a month and a half in the summer of 1989.

After Holland began assembling the dredge, it encountered delays and requirements for work that it professes not to have anticipated, and it therefore submitted claims for extra compensation. Ellicott refused to pay most of the additional claims, contending that these cost variations resulted from Holland's inexperience and incompetence. Holland, however, maintains that most of the extra costs were caused by late shipments of material and by a labor strike in Australia. In any event, Holland demanded $595,126 for cost overruns, contacting Ellicott several times during and after the performance of the contract, which Holland completed in December 1989. After Holland threatened suit in Australia, Ellicott filed this action in federal district court in Maryland, seeking a declaration that it owed Holland nothing on the subcontract.

Ellicott served Holland under Maryland's long-arm statute[1] by having a private process server deliver its summons and complaint to a Holland employee in Australia.[2] When Holland failed to appear or answer, Ellicott moved for a default judgment, which

---

1. Md.Cts. & Jud.Proc.Code Ann. § 6–103.

2. Holland raises objections to the validity of the service, contending that Ellicott's private process server delivered the summons and complaint to a lower level employee who was unauthorized to accept service. We find it unnecessary to address this argument because we hold for Holland on the due process issue.

the court granted on June 14, 1990.[3] Holland apparently first learned of the default judgment when notified by Ellicott, and immediately filed its motion for relief from and vacation of the judgment. Holland argued that the district court lacked personal jurisdiction over it because of its insufficient contacts with the forum state of Maryland. The district court, accepting the magistrate's recommendation, granted Holland's motion. Ellicott brings this appeal.

## II

When evaluating the propriety of personal jurisdiction obtained under a state long-arm statute, our task is normally a two-step process. *English & Smith v. Metzger,* 901 F.2d 36, 38 (4th Cir.1990). In the first step, we determine whether the long-arm statute authorizes the exercise of jurisdiction in the circumstances presented. If we answer that affirmatively, we consider whether the exercise of jurisdiction comports with Fourteenth Amendment due process standards. *Id.*

The portion of Maryland's long-arm statute on which Ellicott bases its theory of personal jurisdiction gives a court the power to "exercise personal jurisdiction over a person, who directly or by an agent ... [t]ransacts any business or performs any character of work or service in the State." Md.Cts. & Jud.Proc.Code Ann. § 6–103(b)(1). Ellicott contends that Holland's contractual negotiations with Ellicott's Baltimore offices constituted a transaction of business in Maryland. We need not, however, determine that issue separately from the due process question. Because the Maryland legislature designed its long-arm statute to extend personal jurisdiction to the limits allowed by federal due process, our normal two-step inquiry merges into one. *See Mohamed v. Michael,* 279 Md. 653, 657, 370 A.2d 551 (1977).

Our due process analysis starts with the minimum contacts inquiry: " 'The constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established 'minimum contacts' in the forum state.' " *Asahi Metal Indus. v. Superior Court of Cal.,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 1030–31, 94 L.Ed.2d 92 (1987) (plurality opinion) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Minimum contacts exist where the defendant " 'purposefully direct[s]' " its activities toward the residents of the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). If the defendant has created a substantial connection to the forum, then he has purposefully "availed himself of the privilege of conducting business there." *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184.

The Supreme Court, however, has emphasized that our inquiry is not singularly focused. We are reminded that minimum contacts can provide a basis for personal jurisdiction only if they satisfy the concept of "fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (quotation omitted). The Supreme Court's decision in *Burger King* emphasizes that the "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185. In other words, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Id.* at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160).

**3.** Meanwhile, Holland asserted its claims in an action filed in the Supreme Court of Western Australia. Ellicott failed to respond to this suit, and on June 19, 1990, the court there entered a default judgment against Ellicott. Because Ellicott had no assets in Australia at that time, Holland was unable to enforce its judgment.

### III

■ Applying these principles to the circumstances here, there is no question that Holland purposefully initiated the business relationship between the parties. When its bid for the assembly work was denied in Australia, Holland pursued Ellicott to Maryland and executed the contract by fax and telephone. Mitigating the significance of these contacts, however, is the fact that the contract was not performed in Maryland nor did it result from a longstanding business relationship with Ellicott. In fact, Holland had no other interest in Maryland, and its contacts with Ellicott in Maryland appear to be its sole venture into that state. *Cf. English & Smith v. Metzger*, 901 F.2d 36, 39–40 (4th Cir.1990) (finding sufficient contacts with Virginia where the cause of action arose from the defendant's activities in the forum, the defendant initiated the contractual relationship there, the contract was executed there, and the plaintiff performed its part of the contract there); *Du–Al Corp. v. Rudolph Beaver, Inc.*, 540 F.2d 1230, 1233 (4th Cir. 1976) (holding that because the defendant entered into and performed a contract in Maryland, it purposefully availed itself of conducting activities within that forum).

In *Burger King*, the Court emphasized that a contract in and of itself does not automatically constitute sufficient minimum contacts to support personal jurisdiction, but there found sufficient contacts with the forum state. *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185. Although the Supreme Court found that Rudzewicz, a Michigan franchisee, had sufficient contacts with the forum state of Florida, we find compelling differences between that case and the one we now review. The single contract dispute (franchise agreement) considered in *Burger King*

> grew directly out of a contract which had a *substantial* connection with [Florida]. Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purpose of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organiza-

tion. Upon approval, he entered into a carefully structured 20–year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, that quality and nature of his relationship to the company in Florida can in no sense be viewed as random, fortuitous, or attenuated.

*Id.* at 479–80, 104 S.Ct. at 2186 (quotations and citations omitted).

In contrast, the Ellicott/Holland dispute did not grow out of a contract "which had a *substantial* connection" with Maryland. To begin with, the contract was not performed in Maryland; all the contract work was performed at the Cooljarloo mining site. Additionally, Holland did not contemplate a long-term relationship with "continuing and wide-reaching contacts" with Ellicott in Maryland. It completed the assembly contract in four months, and there is no indication that any future contracts were planned between the parties. And, the contract here contains no choice-of-law provision—unlike the *Burger King* contract, which provided that all controversies would be governed by Florida law. *Id.* at 481, 104 S.Ct. at 2186. The only contractual reference to controlling law of any sort required "[a]ll work to be accomplished ... consistent with Australian statutes and regulations." Finally, Holland's contacts are not only different from those the Court approved in *Burger King* for the exercise of jurisdiction but are similar to the contacts that the *Asahi* Court disapproved as insufficient for jurisdictional support. *See Asahi Metal Indus. v. Superior Court of Cal.*, 480 U.S. 102, 112–13, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987) (plurality opinion). Like the defendant in *Asahi*, Holland "does not do business in [Maryland]. It has no office, agents, employees, or property in [Maryland]. It does not advertise or otherwise solicit business in [Maryland]." *Id.*

■ In sum, the scenario here involves a private corporation from a foreign country whose only contacts with a United States corporation and the Maryland forum resulted from a single, short-term contract performed

abroad. Although the purposefully pursued contract may be characterized as a contact, it is a fairly insubstantial one. *Cf. Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062, 1068–69 (4th Cir.1982) (holding that defendant's initiation of a contract was dispositive of the minimum contacts inquiry because there were other contacts that substantially connected the defendant to the forum).

In any event, the insubstantial character of Holland's contacts with Maryland, together with the substantial connection of the whole venture with Australia, requires a more concerned focus on the second prong of the due process analysis, *i.e.,* whether in spite of minimum contacts, the court's exercise of personal jurisdiction would comport with traditional notions of "fair play and substantial justice." In *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Supreme Court in this context identified five factors to consider in deciding whether it is unreasonable to hale a defendant into an out-of-state forum. They are:

> the burden on the defendant, ... the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, ... the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies.

*Id.,* at 292, 100 S.Ct. at 564 (citations omitted). *Asahi* made clear that these factors apply with particular force in actions against foreign national defendants. In the majority section of the *Asahi* opinion,[4] the Court counseled that *World–Wide Volkswagen's*

> advice calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by

the assertion of jurisdiction by the [United States forum]. The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.

*Asahi,* 480 U.S. at 115, 107 S.Ct. at 1034 (quotation omitted).

Applying those principles here, we conclude that Maryland's exercise of personal jurisdiction over Holland would not comport with traditional notions of "fair play and substantial justice." Maryland, of course, has an interest in adjudicating the action insofar as it seeks to ensure the economic health of its citizens and the fair resolution of their disputes. This concern diminishes, however, as Maryland's citizens seek their fortune away from home—particularly when they compete for a slice of foreign pie made entirely from foreign materials and intended primarily for foreign consumption. Ellicott, too, has an interest in obtaining convenient and effective relief, including not sending its employees to Australia for trial or hiring foreign counsel. But, there is no indication that Australian trials are any less fair than American ones or that the relief provided by an Australian tribunal is less effective. *Cf. In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195, 205–06 (2d Cir.) (addressing defendant's

---

4. In *Asahi,* four justices agreed that Asahi did not have sufficient minimum contacts with California. *Asahi,* 480 U.S. at 112–113, 107 S.Ct. at 1032–1033 (O'Connor, J., joined by Rehnquist, C.J., Powell, and Scalia, J.J.) Four justices disagreed, concluding that Asahi had sufficient minimum contacts with California. *Id.* at 121, 107 S.Ct. at 1036 (Brennan, J., joined by White, Marshall, and Blackmun, J.J.). Every justice, but Justice Scalia, however, agreed that California's

exercise of jurisdiction would be inconsistent with fair play and substantial justice. *Id.* at 116, 107 S.Ct. at 1034. Three justices found it unnecessary to reach the minimum contacts issue once they concluded that the exercise of personal jurisdiction would violate the "fair play and substantial justice" requirement. *Id.* at 121, 107 S.Ct. at 1036 (Stevens, J., joined by White, and Blackmun, J.J.).

**480**

concerns that an Indian court would not observe due process standards followed by the United States courts), *cert. denied sub nom. Executive Comm. Members v. Union of India,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). Litigating in Maryland would unquestionably impose a heavy burden on Holland. *See Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033. Nearly all aspects of the contract took place in Australia and principally affected Australian interests. Witnesses to the disputed incidents are located primarily in Australia. They would need to cross the globe for a trial that could last many weeks.

Continuing in the *World–Wide Volkswagen* analysis, we perceive that the issues here implicate fundamental substantive social policies affecting international trade, business, and sovereignty concerns. The involvement of these policies weighs against the reasonableness of jurisdiction in Maryland. Moreover, we are persuaded by the overwhelming Australian focus of the Holland/Ellicott contract that it could be more efficiently adjudicated in the Australian judicial system. Here, the general contract was to be performed for Minproc, an Australian corporation. The completed dredge was to be used in an Australian mining project, and the mined minerals were to be processed by Australian companies. The merits of the dispute also involve an Australian labor dispute and Australian shipping delays. In our view, the total picture implicates the concerns expressed in *Asahi* for constraint in the exercise of personal jurisdiction in an international context.

For these reasons, the judgment of the district court is affirmed.

AFFIRMED.