THE HARRY AND JEANETTE
WEINBERG FOUNDATION
INCORPORATED

v.

ANB INVESTMENT MANAGEMENT
AND TRUST COMPANY

Civil No. JFM–96–3770.

United States District Court,
D. Maryland.

May 7, 1997.

Charles P. Scheeler, Piper and Marbury, Baltimore, MD, Shale D. Stiller, Frank, Bernstein, Conaway & Goldman, Baltimore, MD, for plaintiff.

Paul Walter, Tydings & Rosenberg, Baltimore, MD, for defendant.

## MEMORANDUM

MOTZ, District Judge.

This action has been brought by The Harry and Jeanette Weinberg Foundation Incorporated ("the Foundation") against ANB Investment Management and Trust Company ("ANB"). The Foundation is a Maryland-based private charitable foundation, and ANB is an Illinois trust company that entered into a contract whereby it would administer over $250,000,000 of the Foundation's funds. The gravamen of the Foundation's claims is that ANB engaged in a transaction (converting the Foundation's investment portfolio from certain funds into a newly-created one) which was unauthorized by the Foundation and which resulted in a taxable capital gain of over $38,000,000.

ANB has filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer this action to the United States District Court for the Northern District of Illinois.

### A.

The facts pertinent to ANB's motion may be briefly stated. The trust agreement pursuant to which ANB administered assets for the Foundation was entered into in 1992 between the Foundation and a corporate predecessor of ANB.[1] ANB drafted the trust agreement in Chicago after incorporating certain modifications proposed by the Foundation's counsel. After itself signing the agreement, ANB mailed it to the Foundation in Maryland for final execution. The agreement provides that it is to be governed by the laws of Illinois.

It is undisputed that at no time in negotiating or executing the trust agreement did anyone from ANB physically enter Maryland. The relationship between the Foundation and ANB came about when a consulting firm, acting on behalf of the Foundation, undertook to help the Foundation find a trust manager for a portion of its assets. The consulting firm contacted ANB and all of ANB's discussions with the firm took place in Chicago.

It is also undisputed that ANB has never sent any officer, employee or other agent into Maryland to service the trust agreement with ANB. All that ANB has done is to mail the Foundation monthly statements and annual reports reflecting the status of the Foundation's accounts. The trust accounts are located in Illinois, and all decisions related to the Foundation's investments are made by ANB in Chicago. ANB has initiated no more than two or three telephone calls to the Foundation during their five-year relationship. No ANB officer or employer has ever met with the Foundation's directors, officers or employees at any time, in Maryland or

---

1. Because the corporate restructuring that has resulted in ANB now serving as the trustee under the agreement is immaterial to the jurisdictional issues, I will refer to ANB and its predecessor collectively as "ANB."

elsewhere. ANB has communicated with the Foundation through the Foundation's consultant in Chicago. An alleged misrepresentation concerning the nontaxability of the transaction in question, which appears to be quite material to the case, was made during a telephone conversation between an ANB employee in Chicago and a Foundation employee.

ANB has no other relationship with Maryland. Over the past five years it has received an annual fee of approximately $140,000—a total of more than $700,000—from the Foundation under the agreement.

### B.

■ The Foundation relies upon Section 6–103(b)(4) of Maryland's long arm statute, Md.Code Ann., Cts. & Jud. Proc. § 6–103(b)(4), to sustain jurisdiction over ANB. That section extends jurisdiction over any person who

> [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State.

There is no evidence that ANB has regularly done or solicited business or engaged in any other persistent course of conduct in Maryland. Therefore, ANB is subject to jurisdiction under Section 6–103(b)(4) only if it has "derive[d] substantial revenue from ... services ... used ... in the State." I have no difficulty in concluding that the receipt of over $700,000 over a five-year period

does constitute the derivation of substantial revenue. However, a serious question exists as to whether investment services performed in Illinois relating to assets which are held in that state are "used" in Maryland even if the owner of the assets is located in Maryland.[2] For reasons that I will state in a moment it is enough that the question is a close one.

### C.

■ At least equally close is the question whether the assertion of personal jurisdiction over ANB in Maryland would be constitutional. I will not bother to recite the hornbook principles established by *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) and *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Suffice it to say that in recent years the Fourth Circuit has taken a somewhat restrictive view of the constitutional reach of long-arm statutes, emphasizing that the inquiry is not one of mere reasonableness. Rather, the Fourth Circuit has made it clear that due process requires that a defendant's contacts with the forum state be tantamount to physical presence there. *See, e.g., Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 437, 136 L.Ed.2d 334 (1996); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d

2. ANB also argues that the recent decision of the Maryland Court of Appeals in *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), vitiates the assertion of personal jurisdiction under Section 6–103(b)(4). The issue presented in *Kann* was whether there is a right to a jury trial in a beneficiary's action against a trustee for a loss caused by an alleged breach of trust. The Court of Appeals found that no such right exists, holding that beneficiaries' remedies against trustees are exclusively equitable and that there is no action at law sounding in tort for a trustee's breach of fiduciary duty. *Id.* at 702–06, 690 A.2d at 515–17. I am unpersuaded by this argument. The question of whether a trustee's breach of

fiduciary duty constitutes a tort for the purpose of determining if there is a right to a jury trial is far different from the question of whether a trustee's breach of fiduciary duty causes "tortious injury" for the purpose of establishing personal jurisdiction under the long-arm statute. The latter question does not properly turn on historical distinctions between law and equity but on such practical considerations as the nature and extent of in-state contacts, the parties' reasonable expectations, and Maryland's legitimate interest (as articulated by the General Assembly) in providing a forum for vindicating the rights of its citizens.

939 (4th Cir.1994); *Ellicott Mach. Corp. v. John Holland Party Ltd.,* 995 F.2d 474 (4th Cir.1993).

█ Although the facts in *Stover, Lesnick,* and *Ellicott Machine* argued more strongly than do those presented here for finding the exercise of personal jurisdiction unconstitutional, the doctrinal approach taken by the court at least draws into serious question whether it would sustain the assertion of jurisdiction over a defendant who, like ANB, has never traveled into the forum state, did not solicit the business giving rise to plaintiff's claims, and has had no contact with the forum state other than to derive revenues (substantial though they may be) from an agreement with a resident of the forum state.[3]

### D.

Against this background I will follow the approach that I enunciated in *Joseph M. Coleman & Assocs. Ltd. v. Colonial Metals,* 887 F.Supp. 116, 120 (D.Md.1995), of exercising my discretion to transfer the action to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). Both the statutory construction and the constitutional issues here presented are close ones. As I stated in *Coleman,*

> [t]here is no reason to inject such ... question[s] into the case unnecessarily. It would not be in the interest of any of the parties or any of the witnesses to litigate this case in Maryland, only to have a ruling upholding the assertion of jurisdiction over ... [ANB] reversed on appeal. Nor would

that course further the general public interest in the sound and efficient administration of justice or effectuate the specific purposes of the Civil Justice Reform Act of 1990 to reduce the cost and delay of litigation.

Further, as in *Coleman,* it is certainly not unduly burdensome to require the Foundation to travel to Chicago to litigate this case. Indeed, in light of the choice of law provision contained in the trust agreement, it is entirely appropriate for a federal district court in Illinois to resolve any questions of law that are presented.

For these reasons, this action will be transferred to the United States District Court for the Northern District of Illinois. A separate order to that effect is being entered herewith.

---

**3.** Perhaps the strongest case supporting the Foundation's position is *Burger King v. Rudzewicz, supra.* However, *Burger King* is distinguishable on several grounds. First, the contract there at issue established "a carefully structured 20–year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida [the forum state]." 471 U.S. at 480, 105 S.Ct. at 2186. Second, the agreement provided that it was to "be governed and construed under and in accordance with the laws of the State of Florida." *Id.* at 481, 105 S.Ct. at 2187. Third, the defendant's partner had traveled to Florida at least briefly for a management training session under the agreement. *Id.* at 466, 479 n. 22, 105 S.Ct. at 2178, 2185 n. 22. Fourth, national franchise agreements, such as the one involved in *Burger King,* present unique policy issues involv-

ing protection of trademarks and maintenance of uniform standards. Fifth, the long-arm statute enacted by the Florida legislature clearly covered the defendant, subjecting to personal jurisdiction anyone who "[b]reach[es] a contract in this state by failing to perform acts required by the contract to be performed in this state." *Id.* at 463, 105 S.Ct. at 2177. Although this last consideration may not be germane to the constitutional issue, a court should be reluctant to construe statutory language which is ambiguous, at least in a specific factual context (such as the phrase "services ... used ... in the State" contained in Section 6–103(b)(4)), so as to make its application constitutionally dubious. *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 628–29, 113 S.Ct. 2264, 2282–83, 124 L.Ed.2d 539 (1993).