**FRONTLINE TEST EQUIPMENT, INC., Plaintiff,**

v.

**GREENLEAF SOFTWARE, INC., Defendant.**

No. Civ.A. 97–00139–C.

United States District Court, W.D. Virginia, Charlottesville Division.

June 3, 1998.

---

584

Paul H. Schwartz, Charlottesville, VA, for Frontline Test Equipment, Inc., plaintiff.

Sheldon H. Parker, Parker & Destefano, Charlottesville, VA, for Greenleaf Software, Inc., defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

*Factual and Procedural Background*

This case arises out of a software distribution contract. In 1988, Greenleaf (a Texas corporation) and Advanced Computer Consulting, Inc., Frontline's predecessor in interest (both Virginia corporations),[1] entered into a five-year private label license agreement ("Agreement"). The agreement authorized Greenleaf to distribute Advanced Computer Consulting's serial data analyzer software product (known as "Serialtest") under Greenleaf's trademark, "Viewcomm."[2] For each copy distributed, Greenleaf was to pay Advance Computer Consulting a royalty. In the contract, Advanced Computer Consulting bound itself to deliver a floppy diskette containing the object code form of the program and user instructions ("Documentation") for use as a master diskette for the distribution of the program and instructions to Greenleaf customers. Advanced Computer Consulting also agreed to include a hard copy (paper print-out, non-diskette) of the source code form of the program for internal use only (although Greenleaf asserts that no hard copy of the source code was ever delivered). The contract grants to Greenleaf:

a non-exclusive, non-transferable worldwide license to sublicense the Software and Documentation and all enhancements, upgrades, additions, new versions and/or modifications to the Software and/or Documentation made by ACCI during the term of this Agreement, solely in the form of the Greenleaf Product and solely for use as a stand-alone serial data analyzer, and not for use as a part of, or merger with, any other software.... The foregoing non-exclusive license grant is subject ... to the condition that Greenleaf will not merge the Software into any other computer software or sublicense or attempt to sublicense third parties to merge the Software with other computer software.

The contract prohibits Greenleaf from "modify[ing]' or translat[ing]' the Software or Documentation or any portion thereof or prepar[ing]' derivative works therefrom without the prior written consent of ACCU." The contract states an expiration date of December 31, 1993 and provides that the laws of Virginia govern the agreement. Moreover, the contract expressly states, "Greenleaf

---

1. For purposes of this motion, the defendant does not dispute that Advanced Computer Consulting is Frontline's predecessor in interest.

2. Programs, also known as software, are lists of instructions, written by a programmer, to a computer. The computer follows the instructions. At some point, a compiler must translate the list of instructions written by the programmer into a language that the computer can understand. Before translation, the list of instructions is called the source code. After translation, the list is called object code. The Agreement in the instant case allowed Greenleaf distribute the object code to customers. That list of instructions, the object code, allowed customers to check the integrity of data transmission in their computers as explained below.

Computers can exchange information through the transmission of bits of data in a stream, one after the other (called serial communication). The program sold by the companies in the instant case checked that customers' computer were properly transmitting data. The sale included sets of cable (in order to confirm that if a problem was found with transmission, the problem lay with the computer rather than the connecting cables). Greenleaf agreed to buy the cable sets from Frontline/Advanced Computer Consulting who agreed, in return, to furnish such sets to Greenleaf in the quantities required for resale to Greenleaf customers.

hereby submits to the jurisdiction of the courts of Virginia for the resolution of any dispute arising out of or in connection with this Agreement."

After the contract terminated in 1993, the parties continued their relationship. They did not renew the original contract, nor did they draw up a new contract. On January 10, 1994, Tammie K. Williams, then–Vice President of Greenleaf wrote to Paul Govert of Frontline, "As we have agreed, the original contract signed November 2, 1988 and expiring December 31, 1993 is the contract we are currently using to resell ViewComm. It will continue to be the legal instrument until we have reached an agreement in writing which states otherwise." No other communication regarding a contract appears in the record.

Conflict arose a few years later. In 1995, Greenleaf attempted to license the source code for Serialtest. Frontline refused to license the source code. In late 1996, Frontline became aware of a demonstration of a new Greenleaf product, "ViewComm for Windows," which product Frontline alleges is a derivative work from the original Serialtest in violation of the parties' contract.[3] Frontline alleges that when Frontline contacted Greenleaf's president Mr. Don Killen, Mr. Killen stated that Greenleaf's Windows product aimed to reproduce the look and feel of the original Serialtest. Mr. Killen denies making this statement. Greenleaf's ViewComm for Windows, version 1.1 shipped in September 1997.[4]

In order to create ViewComm for Windows, Greenleaf either modified the existing serial data analyzer program or created from whole cloth a new, but remarkably similar, serial data analyzer program for Windows. Frontline alleges that Greenleaf derived its ViewComm for Windows from Serialtest. Derivative software is software created from existing programs. The contract between Greenleaf and ACCI/Frontline forbade Greenleaf to create such derivative software from Serialtest. Typically, a derivative program would be created by amending the source code (non-machine language program) and then compiling it anew to create a new object code (machine language).

Greenleaf alleges, as noted above, that it never received the hard copy of the source code of the Serialtest program and, thus, could not have created derivative software from said code. However, it is also possible to create derivative software with only object code through a process known as reverse engineering. This process involves taking apart the application program to discover how it works with the goal of imitating all or part of the program. This process can be accomplished with only the object code. Thus, Greenleaf could have reverse engineered the object code version of Serialtest, written essentially the same program, and then created the derivative ViewComm for Windows from that program. Such a process could still violate the terms of the contract.[5]

---

3. Personal computers operate on two basic models: the Macintosh model or the DOS model. Macintosh computers have always been visually oriented: the user tells the computer what to do and moves objects around within the computer by pointing at various pictures on the computer screen. Originally, DOS-based computers operated by written lists of instructions, called "MS–DOS" (standing for Microsoft Disk Operating System). Such a system was difficult for the average computer user (because basically you had to memorize certain commands to get the computer to do what you wanted it to do). In the late 1980s, Microsoft Corporation developed a program, Windows, that made DOS-type computers work, like the original Macintosh system, with pictures rather than written instructions. Windows proved both revolutionary and popular. Eventually, it became more like an operating system itself and less an overlaying program on top of the DOS operating system. Companies

raced to produce programs that could work within Windows so that people could use the programs with greater ease. Enormous profits could be made from making Windows versions of existing programs. The original Serialtest program was DOS-based. Greenleaf's new product was Windows-based.

4. Frontline did not make available its Serialtest for Windows until December 1997 (a new & improved version came out in March 1998).

5. At least one court has held that such reverse engineered code may be a violation of the Federal Copyright Act. *Sega Enters. Ltd. v. Accolade, Inc.* holds that such a translation of the object code "may infringe the exclusive rights granted to the copyright owner in section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights." 977 F.2d 1510, 1519 (9th Cir.1992).

In November 1997, Frontline filed a complaint against Greenleaf alleging Breach of Contract (Count I), Federal Copyright Infringement (Count II), Virginia Common Law Trademark Infringement (Count III), and Federal Unfair Competition (Count IV). On January 23, 1998, Defendant filed a motion to dismiss for lack of personal jurisdiction, improper venue, failure to state a claim, or to transfer the case to the Northern District of Texas. Plaintiff filed a memorandum in opposition on March 6, 1998.

On March 27, 1998, Magistrate Judge B. Waugh Crigler held a hearing on the defendant's motion to dismiss or, alternatively, to transfer to the Northern District of Texas. The magistrate judge recommended that this court deny the motion to dismiss. He found that the 1988 contract between the parties continued through the time period relevant to the instant action. Because he found that the contract continued to govern the parties' relationship, he found that the defendant had submitted to jurisdiction in Virginia. Finding no other facts required transfer to the Northern District of Texas, the magistrate judge recommended that the court deny the motion to transfer as well.

On May 8, 1998, the defendant objected to the report and recommendation, and plaintiff responded to the objections. The defendant asserts that the magistrate judge incorrectly weighed the factors in analyzing the motion to transfer (giving insufficient weight to the illness of Greenleaf's president) and improperly relied on the contract and its forum selection clause. Moreover, the defendant asserts that the magistrate judge erred in failing to recommend a finding that the Federal Copyright Act preempts the breach of contract claim. The plaintiff's response focuses on the forum selection clause of the contract and the defendant's contacts with Virginia to support jurisdiction in this court. As to preemption, the plaintiff argues that

the magistrate judge correctly found that the contract regulated the conduct of the parties to a degree beyond that regulation provided by the Federal Copyright Act.

The court has considered carefully the file, the pleadings, and the law. It has conducted a *de novo* review of the analysis and conclusions of the magistrate judge. *Orpiano v. Johnson,* 687 F.2d 44, 48 (4th Cir.1982). For the reasons set out below, the court adopts the report and recommendation of the magistrate judge in full, denies the defendant's motion to dismiss, and denies the defendant's motion to transfer.

*Personal Jurisdiction*

Personal jurisdiction is the power of the court to require a defendant to come into the state to defend a lawsuit in that state. Generally, the court evaluates the existence of personal jurisdiction first with reference to the appropriate state long-arm statute, within the limits of the United States Constitution. In Virginia, long-arm jurisdiction is consistent with the constitutional limits of personal jurisdiction. Section 8.01–328.1 of the Virginia Code provides, in pertinent part, that, "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's ... [t]ransacting any business in this State." "The Virginia Supreme Court has indicated that § 8.01–328.1 permits the assertion of in personam jurisdiction to the full extent permissible under the due process clause of the Fourteenth Amendment." *General Electric Co. v. Rose International, Inc.,* 475 F.Supp. 602, 605 (W.D.Va.1979), citing, *John G. Kolbe, Inc. v. Chromodern Chair Co.,* 211 Va. 736, 180 S.E.2d 664, 667 (1971).

There are a number of bases for personal jurisdiction under the Constitution, including consent and minimum contacts. *International Shoe v. Washington* requires that a court exercise personal jurisdiction over a defendant only if that defendant has

For a discussion of the policy and market implications of reverse engineering, see Arthur R. Miller, *Copyright Protection for Computer Programs, Databases, and Computer–Generated Works: Is Anything New Since CONTU?* 106 Harv.L.Rev. 978 (1993) (arguing that reverse engineering permits a "second comer to create a market substitute and reap the benefits of a suc-

cessful program after others have incurred the risk and expense of its development."); Andrew Johnson–Laird, *Software Reverse Engineering in the Real World,* 29 U.Dayton L.Rev. 843 (1994) (arguing that reverse engineering is too expensive and time-consuming a process to pose a realistic threat to software developers).

such minimum contacts that it would be fair to require the defendant to come to the state to defend the suit. 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The minimum contacts analysis requires the court to consider: the defendant's burden in defending the suit in the forum state, the forum state's interest in the suit, the plaintiff's interest in convenient and effective relief, and the state's interest in furthering fundamental social policies. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Continuous and substantial activity in a state will create general in personam jurisdiction, allowing the defendant to be sued in the state for most claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). However, even a single act, because of its "quality and nature" may be sufficient to support specific in personam jurisdiction, allowing the defendant to be sued in the state for claims arising out of that act. *See, e.g., McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (upholding court's assertion of jurisdiction over claim arising out of a contract solicited in the forum state).

The defendant in the case before the court claims that it does not have sufficient contacts with Virginia to support personal jurisdiction in this court. Defendant further asserts that this case arises out of no written contract and involves different parties and a different product than those involved in the contract offered by the plaintiff. The defendant claims that the contract, in which Greenleaf submits to the jurisdiction of Virginia courts, is no longer valid. In response to a letter, produced by the plaintiff, from Greenleaf to Frontline stating that the original contract would continue to guide the relationship of the two parties, the defendant makes the bare assertion that the author of the letter is no longer employed by Greenleaf and that the letter does not govern the relationship. Additionally, the defendant argues that its president, Mr. Don Killen, is critical-

ly ill, unable to travel to Virginia to defend this suit, and central to the suit.

When the defendant challenges the court's jurisdiction with a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the burden rests on the "plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Laboratories, Inc. v. Akzo,* 2 F.3d 56, 59–60 (4th Cir.1993), *citing, Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989); *Dowless v. Warren–Rupp Houdailles, Inc.,* 800 F.2d 1305, 1307 (4th Cir.1986); 2A James W. Moore, Moore's Federal Practice 12.07[2.–2] (1985 & Supp.1992–93).[6] However, "the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiffs favor." *Id., also citing, Wolf v. Richmond County Hosp. Auth.,* 745 F.2d 904, 908 (4th Cir.1984).

■ The court finds that the defendant is subject to personal jurisdiction in this court. The 1988 contract stated that the defendant submitted to personal jurisdiction in Virginia. Despite the change from ACCI to Frontline, the parties continued to operate under the contract. The January 10, 1994 letter from Greenleaf's then-vice-president to Frontline states that the contract shall continue to govern the relations of the parties until a new contract is signed. The contract indicates, to this court's mind, not only that the contract continued, but also that it continued with Frontline stepping into the shoes of ACCI. The allegations of the plaintiff arise out of that contract—the dispute is directly related to the contract's prohibition on derivative software—and, therefore, personal jurisdiction based on the contract is appropriate. Moreover, the defendant has had continuous dealings with Virginia domiciliary Frontline (and its predecessor in interest) since 1988.

The court finds that there is no evidence that to bring Greenleaf to Virginia to defend itself would be fundamentally unfair. The court is not unaware of the illness of the president of Greenleaf. However, defendant could expect to face suit in Virginia after

---

**6.** When the defendant bases a motion for dismissal only upon the pleadings, affidavits, and supporting documents, the plaintiff need only make a *prima facie* showing of jurisdiction.

*Klockner–Pentaplast of America, Inc. v. Roth Display Corp.,* 860 F.Supp. 1119, 1121 (W.D.Va. 1994).

agreeing to a Virginia forum in the original contract and then by constantly reaffirming its connection to Virginia with ongoing discussions (such as the 1995 request for a sale of the source code license) and sales of cable sets. The defendant's contacts with Virginia were purposeful and continuous throughout the relationship with Frontline.

Defendant cites two cases to support its assertion that an exercise of personal jurisdiction over the defendant would be improper; the cases are inapposite to the situation at hand. In *Ellicott Machine Corporation v. John Holland Party Limited*, the parties agreed to a contract in Maryland, but no other circumstances connected the cause of action to Maryland. 995 F.2d 474, 478 (4th cir.1993). Significantly, in *Ellicott*, there was no choice of law clause in the contract. *Id.* The *Ellicott* court uses the lack of a choice of law clause to distinguish *Ellicott* from *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *Id.* Moreover, *Ellicott* involved a foreign corporation. Thus, the court likened *Ellicott* to *Asahi Metal Industry v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), in which the Supreme Court held that a foreign corporation did not have sufficient contacts with the forum state to comport with due process. *Ellicott, supra*, 995 F.2d at 478–79. Courts should exercise some additional caution when forcing foreign corporations to defend themselves in a foreign legal system in the United States. *See, Asahi, supra*, 480 U.S. at 113, 107 S.Ct. 1026; *Ellicott, supra*, 995 F.2d 474. The factual differences between the case before the court and *Ellicott* render *Ellicott* a poor touchstone for this court's analysis.

Nor does *Chung v. NANA Development Corporation* support the defendant's position. *Chung* involved only one transaction: one sale of frozen reindeer antlers which inopportunely thawed during shipment to Virginia. 783 F.2d 1124 (4th Cir.1986). The case currently before the court involves a continuing relationship in which a Texas domiciliary not only sought out a Virginia corporation, but continued to deal with said corporation and agreed, at the outset, to be bound by the laws of that corporation's domicile. The dis-

tinction between the relationship and the constant awareness of the location of the other party are important to the analysis of personal jurisdiction. As with *Ellicott*, the fact pattern in *Chung* differs from the instant case in ways too important to allow the analogy the defendant attempts.

Because the court finds that the 1988 contract continued to govern the relationship of the parties and that the defendant had continuous and substantial contacts with Virginia through its deliberate, ongoing relationship with a Virginia corporation, the court now holds that the defendant is subject to in personam jurisdiction in this court. However, the fact that the defendant is subject to personal jurisdiction does not resolve the issue of whether a district court may or should transfer a case to another district. That analysis is set out *infra*. The court addresses briefly, however, the defendant's objection to the magistrate judge's recommendation that the court find venue proper in this court.

*Improper Venue*

■ Defendant objects, without explaining why, that the magistrate judge incorrectly recommended that this court find venue improper in this court. The objection is without merit. Section 1391 of Title 28 of the United States Code provides that "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." (1993 and 1997 Supp.). Thus, venue is proper generally where personal jurisdiction can be asserted over the corporate defendant. "The Federal Circuit, in *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed.Cir. 1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991), held that the test for venue under section 1400(b) with respect to a defendant that is a corporation, in light of the 1988 amendment to 28 U.S.C. § 1391(c), is whether the defendant was subject to personal jurisdiction in the district of suit at the time the action was commenced. 28 U.S.C. §§ 1391(c) & 1400(b)." *Plant Genetic Systems, N.V. v. Ciba Seeds*, 933

F.Supp. 519, 526 (M.D.N.C.1996).[7] Under this analysis of 28 U.S.C. §§ 1391 and 1400, venue is proper in the instant case because personal jurisdiction was proper.

*Motion to Transfer to the Northern District of Texas*

Once a court has found that venue and personal jurisdiction are proper in that court, it may yet transfer an action to any district "where it might have been brought" "for the convenience of parties and witnesses, and in the interest of justice." 28 U.S.C. § 1404(a). Defendant objects that the magistrate judge improperly weighed the factors in his analysis. The court finds this objection also without merit.

■ While a case may be transferred to a district in which it might have been brought in the interest of justice, a plaintiff's choice of forum should be accorded considerable weight and should not be rejected unless other substantial factors weigh in favor of transfer. *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir.1984), *citing, Gulf Oil v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The Supreme Court, in *Stewart Organization v. Ricoh Corp.*, explained the proper analysis of a motion to transfer:

> Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964). A motion to transfer under § 1404(a) thus calls on the

district court to weigh in the balance a number of case-specific factors. The presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus.... The flexible and individualized analysis Congress prescribed in § 1404(a) thus encompasses consideration of the parties' private expression of their venue preferences.

487 U.S. 22, 29–30, 108 S.Ct. 2239, 101 L.Ed.2d 22.[8] In analyzing a motion to transfer, some courts have given inconvenience to non-party witnesses greater weight than inconvenience to party witnesses. *See, e.g., State Street Capital Corp. v. Dente*, 855 F.Supp. 192, 197 (S.D.Tex.1994).

■ The court finds a transfer inappropriate in the instant case for five reasons. First, the contract's forum selection clause specifically selected Virginia as the forum for disputes. As discussed *supra*, this court finds that said contract was still in operation. Second, the witnesses are found in both Virginia and Texas. Therefore, neither location is more convenient for the witnesses in general, despite the defendant's preference for a Texas forum. Third, courts generally give preference for the plaintiff's choice of forum. The plaintiff in the instant action chose Virginia as the forum, as did the defendant at one point. Fourth, the case is in no way physically tied to Texas; the action is based on occurrences over the Internet and in software, all of which may be viewed and assembled easily

---

7. The Fourth Circuit has not expressly adopted this rule. However, many district courts have stated a similar rule. *See Imagineering, Inc. v. Van Klassens, Inc.*, 797 F.Supp. 329 (S.D.N.Y. 1992) (holding venue proper in patent infringement action in district where defendants were subject to personal jurisdiction); *Injection Research Specialists v. Polaris Industries, L.P.*, 759 F.Supp. 1511 (D.Colo.1991) (finding venue appropriate in Colorado where partnership was subject to personal jurisdiction at time action commenced); *Biosyntec, Inc. v. Baxter Healthcare Corp.*, 746 F.Supp. 5 (D.Or.1990) (holding venue proper where defendant was subject to personal jurisdiction even when corporation did not reside in district and alleged acts of infringement did not occur in district).

8. The defendant cites numerous factors that the court should consider, but I was unable to find the source of the list. The cited case does not provide such a list; it simply requires the "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Perhaps the list of factors is a amalgamation drawn from several cases, including *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court of California In and For City and County of San Francisco*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); and *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

in Virginia. Moreover, the defendant extended his activities to great distances through travel and the Internet, but now seeks to limit the area within which it may be called upon to respond for those activities. Fifth, the defendants cite only one witness to whom a Virginia forum poses a substantial difficulty. Although the court is not insensitive to the difficulties that the defendant will face due to the illness of Mr. Killen, it finds that the difficulty faced by the defendant does not outweigh the substantial factors which suggest that Virginia is the appropriate forum. The court, therefore, denies the motion to transfer.

*Failure to State a Claim*

The defendant has also objected that the magistrate judge incorrectly recommended denial of the motion to dismiss for failure to state a claim. Federal law governs whether plaintiff's complaint states a claim for which relief may be granted. If the court finds it does not, then the court has no discretion and must dismiss the claim. *Mitchell v. E–Z Way Towers, Inc.*, 269 F.2d 126 (5th Cir. 1959). However, under the liberal pleading standards of the Federal Rules of Civil Procedure, the court has some leeway in determining the sufficiency of the complaint. The court should avoid, if possible, denying a plaintiff the opportunity to have her case adjudicated on the merits. *Reynoldson v. Shillinger*, 907 F.2d 124 (10th Cir.1990). In considering a 12(b)(6) motion, the plaintiff's allegations should be considered as true and construed in the light most favorable to the plaintiff. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640 (7th Cir.1995). However, the court does not have to accept as true, or accept at all, conclusions of law or unsupported conclusions. *Labram v. Havel*, 43 F.3d 918 (holding that statement that defendant owed plaintiff a fiduciary duty was a legal conclusion that need not be accepted by the court); *Washington Legal Found. v. Massa-*

*chusetts Bar Found.*, 993 F.2d 962 (1st Cir. 1993). A 12(b)(6) motion is disfavored. *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97 (5th Cir.1974). As *Conley v. Gibson* explained, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The defendant asserts that plaintiff's breach of contract claim is preempted by section 106 of the Federal Copyright Act, 17 U.S.C. §§ 101–810, 1001–1010 (1996 & Supp. 1997). Section 106 of the Federal Copyright Act provides that, "[s]ubject to section 107 through 120,[9] the owner of the copyright under this title has the exclusive rights to do and to authorize ... reproduc[tion of] the copyright work in copies ... [and] ... prepar[ation of] derivative works based upon the copyrighted work." 17 U.S.C. 106 (1996 & Supp.1997). Section 301 makes the Federal Copyright Act preemptive with respect to other laws: "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 ... are governed exclusively by this title." 17 U.S.C. § 301(a) (1996). However, while section 301 preempts many claims, it does not always preempt all claims as to copyrighted material.

■ The Federal Copyright Act creates a specialized preemption analysis which is somewhat different from the general preemption analysis used by courts faced with overlapping state and federal claims. *Rosciszewski, supra*, 1 F.3d at 228–29; *U.S. ex rel. Berge, supra*, 104 F.3d at 1462–63.[10] The Copyright Act sets up a two-prong test for

---

9. These sections enumerate limitations on the exclusive rights of copyright owners and include: fair use, reproduction by archives, effects of transfer, secondary transmissions, ephemeral recordings, scope of exclusive rights in various media, coin-operated phonorecord players, use with computers, noncommercial broadcasting, private viewing, architectural works.

10. The general preemption analysis focuses on the intent of Congress to determine if a federal law completely preempts possible state claims in a certain area. *Metropolitan Life Insur. Co. v. Massachusetts*, 471 U.S. 724, 747, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

preemption. *U.S. ex rel. Berge v. Bd. of Trustees of University of Alabama*, 104 F.3d 1453, 1463 (4th Cir.1997); *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 228–29 (4th Cir.1993). First, the federal legislation preempts only if the state-law claim applies to work within the "subject matter of copyright." 17 U.S.C. § 301; *Rosciszewski, supra*, 1 F.3d at 229. Second, only those state claims with rights equivalent to those granted by the federal legislation are preempted. *Id.* The Fourth Circuit has made clear that computer programs, in source or object code, are within the scope of copyright. *Rosciszewski, supra*, 1 F.3d at 229 ("computer programs, like the one at issue here, are within the subject matter of copyright"); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir.1993) ("computer program[s] . . . clearly come[ ] within the 'subject matter' of copyright"); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 436 (4th Cir.1986) ("video games are copyrightable"); Michael A. Epstein, Modern Intellectual Property, 2d ed., ch. 10.1.A (1992), *quoting*, H.R.Rep. 94–1476, 94th Cong., 2d Sess. 51–54 (1976) ("the legislative history [of the Copyright Act] . . . explains that . . . computer programs . . . 'could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new legislation.' ").

 However, whether a claim arising out of a dispute over a computer program meets the second prong of the preemption test will depend on the elements of the state claim. Section 301 allows state claims when the non-copyright cause of action contains at least one element that makes it qualitatively different from a claim of copyright infringement; i.e., the state claim is not equivalent to exclusive rights within the scope of federal copyright. *U.S. ex rel. Berge, supra*, 104 F.3d at 1463; *Rosciszewski, supra*, 1 F.3d at 229; *Trandes Corp., supra*, 996 F.2d at 659. If an "extra element" is required by the state law cause of action, then the nature of that action is "qualitatively different from a copyright infringement claim" and may proceed alongside the copyright claims. *Rosciszewski, supra*, 1 F.3d at 230, *quoting*, 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01[B], at 1–14 to 1–15 (1992).

The legislative history of the Copyright Act suggests that Congress did not intend all contract actions to be preempted by the act. Originally, Congress intended to include a list of illustrative examples of actions that would not be preempted by the federal legislation. However, concern in the Justice Department over a different example in the list forced the legislature to discard the list of examples. Nonetheless, the legislative history for the Act states that, "[n]othing in the bill derogates from the rights of parties to contract with each other and to sue for breaches of contract." 1976 U.S.C.C.A.N. 5659, 5748 (P.L. 94–553, p. 132). While the legislature did not include the illustrative list of non-preempted actions, including breach of contract, "both the original inclusion of breach of contract as an example of a cause of action that would survive preemption" and the legislative history otherwise suggest that Congress did not intend to preempt contract causes of action in copyright. *See* Maureen O'Rourke, *Drawing the Boundary Between Copyright and Contract: Copyright Preemption of Software License Terms*, 45 Duke L.J. 479, 518 (1995).

Some courts have held that breach of contract claims necessarily contain an "extra element" insofar as contracts involve specific promises between two parties, rather than obligations which arise by operation of law. *ProCD, Inc. v. Zeidenberg*, out of the Seventh Circuit, explains, "A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.' " 86 F.3d 1447, 1454–55. *See also Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425, 438 (S.D.N.Y.1996). Professor O'Rourke suggests that breach of contract claims should survive preemption because "there is an extra element in such breach of contract actions that renders them qualitatively different from an action in copyright infringement. That extra element is a breach of promise—which also might be labeled a breach of trust or confidential relationship—that would not exist but for the parties' agreement."

O'Rourke, *supra, Drawing the Boundary*, 45 Duke L.J. at 523. According to Professor O'Rourke, the specific promise to the other party provides the extra element that removes the breach of contract claim from the scope of claims preempted by the Federal Copyright Act.

However, *Acorn Structures, Inc. v. Swantz* suggests that, in the Fourth Circuit, a breach of contract claim must contain that extra element to remove it from the shadow of the federal statute. In *Acorn Structures, Inc. v. Swantz*, the defendant signed an agreement with Acorn Structures, Inc., according to which agreement Acorn would design a home and the defendant could either purchase the home as designed or return the drawings to Acorn. 846 F.2d 923, 925 (4th Cir.1988). The defendant did neither, but rather delivered the drawings to a different architect who then built the house for the defendant. *Id.* Acorn sued for breach of contract, conversion, and unjust enrichment for the unauthorized use of the drawings. *Id.* at 926. The Fourth Circuit held that the breach of contract claim was not preempted by the Copyright Act because of the particular usage agreed to in the contract: the defendant did not have to use the drawings, but if he did, he was obligated to purchase them from Acorn. *Id.* The delivery of the drawings for construction by a third party clearly was not a part of a section 106 action, and therefore was a non-preempted breach of contract action. The Fourth Circuit's careful analysis of the added element in the *Acorn* claim seems to reject Professor O'Rourke's suggestion that all contract claims contain an extra element by their very nature. The Fourth Circuit seems more in agreement with Professors Melville and David Nimmer, who state persuasively, "Although the vast majority of contract claims will presumably survive scrutiny ... nonetheless preemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials." *See* Melville B. Nimmer and David Nimmer, 1 Nimmer on Copyright § 1.01[B][1][a] (1994). In the instant case, the plaintiff alleged in the complaint one action which breached the contract of the parties, but did not violate federal copyright law: plaintiff alleged that defendant engaged in uses prohibited by the contract. Specifically, the complaint alleges, in paragraph twelve, that the defendant decompiled the Serialtest program. Decompilation is not forbidden by federal copyright law. *See* 17 U.S.C. § 106. Decompilation was forbidden, however, by the parties' 1988 contract. The contract states, in paragraph 7(b), that Greenleaf agrees to "use and sublicense the Software only as permitted by this Agreement and not in any other manner for any other purpose." If, as plaintiff alleges, Greenleaf decompiled the Serialtest program in order to create the ViewComm for Windows program, then Greenleaf would have violated not only federal copyright law but also the strictures of the 1988 contract. Therefore, the rights of the plaintiff in the instant action are not equivalent to those provided by the federal copyright laws. As noted by Magistrate Judge Crigler, the contract gave the plaintiff additional rights. Therefore, the breach of contract claim is not preempted by the Federal Copyright Act and the motion to dismiss the breach of contract claim must be denied.

An appropriate order this day shall issue.

### ORDER

After a careful review of the record in this case and for the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

1. That the court shall, and hereby does, ADOPT the April 1, 1998 Report and Recommendation of the Magistrate Judge;

2. That the defendant's January 23, 1998 motion to dismiss shall be, and hereby is, DENIED;

3. That the defendant's January 23, 1998 motion to transfer shall be, and hereby is, DENIED; and

4. That the defendant's January 23, 1998 motion to dismiss the breach of contract claim shall be, and hereby is, DENIED.

594

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record and to Magistrate Judge Crigler.