**ALITALIA–LINEE AEREE ITALIANE S.p.A., Plaintiff,**

v.

**CASINOALITALIA.COM, and TECHNOLOGIA JPR, INC., Defendants.**

No. CIV. A. 00–394–A.

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 19, 2001.

Charles Randolph Wolfe, Jr., Michael Charles Greenbaum, Blank, Rome, Comisky & McCauley, L.L.P., Washington, DC, for Plaintiff.

Henrik Jonathan Redway, Burns, Doane, Swecker & Mathis, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this trademark dispute, the plaintiff, an Italian airline, has sued both the foreign registrant of an allegedly infringing domain name *in personam* and the domain name itself *in rem.* At issue on plaintiff's summary judgment motion is whether, consistent with the Anticybersquatting Consumer Protection Act ("ACPA" or the "Act"),[1] a mark owner may maintain *in personam* claims against a domain name registrant concurrently with an *in rem* claim against the domain name. Also presented is the related question whether the Virginia long-arm statute[2] constitutionally reaches the foreign registrant.

## I.

Plaintiff Alitalia–Linee Aeree Italiane S.p.A. ("Alitalia") is Italy's national airline and is in the business of providing air cargo service and passenger transportation between Italy and the United States, among other foreign countries. Alitalia is the owner of a United States Trademark Registration issued on March 21, 1995, for the mark "Alitalia." Alitalia's founders coined the term "Alitalia," which has been used by the airline since 1957, by combining the words "Ali," which in Italian means "wings," and "d'Italia," which means "Italian"; the term "Alitalia," therefore, literally means "Italian wings."

Since Alitalia began operation in 1957, the airline has made continuous and widespread use of the mark "Alitalia" through

---

1. 15 U.S.C. § 1125(d).

2. Va.Code § 8.01–328.1(A).

extensive advertising and other means by which the carrier promotes and sells its services. In this regard, Alitalia spends approximately $60 million per year in advertising and promoting the "Alitalia" logo and mark. In addition, Alitalia maintains a website for its airline business at <www.alitalia.it> and has registered the Internet domain names <www.alitalia.com> and <www.alitalia.net>. A search of the Internet for the word "alitalia," however, returns not only Alitalia's website, but also an Internet site using the domain name <casinoalitalia.com>, which has no affiliation or connection whatever to Alitalia.

Defendant Technologia JPR, Inc., ("JPR") has registered the domain name <casinoalitalia.com> with registrar Network Solutions, Inc., ("NSI"). JPR is an entity established under the laws of the Dominican Republic, and JPR's NSI registration information lists JPR's place of business (including administrative, technical, and billing contacts) as located in Santo Domingo, Dominican Republic. JPR conducts its business entirely outside of the United States, and the company has no offices or other physical presence in the United States; it neither owns nor leases property in the United States and has no employees in the United States. Alitalia claims that JPR registered the domain name on or about October 13, 1999, although it appears from NSI's registration information that JPR registered the domain name with NSI in August 1998.

It is evident from a visit to <casinoalitalia.com> that the website exists for the purpose of conducting the business of online casino gambling. A visitor to the website can play one or more online casino games—e.g., blackjack, poker, keno, slots, craps, and roulette—by opening an account with <casinoalitalia.com> and purchasing casino "credits" that may be used to play individual games. Players can then win credits that can be redeemed for U.S. currency. In this regard, the website appears to be an attempt to simulate the experience of gambling at a conventional "brick and mortar" casino.

A visit to the website also reveals that the term "Alitalia" appears on the first page.[3] Given this, Alitalia, which has not given JPR permission to use the mark "Alitalia" or any variation thereof for any purpose, claims that the domain name <casinoalitalia.com> and JPR's unauthorized use of the term "alitalia" create a false impression that Alitalia promotes the business of online gambling and/or any other enterprise pursued by defendants. Indeed, Alitalia claims that the word "casinó" means "brothel," so that a literal translation of "casinoalitalia" is "alitalia's brothel." Thus, argues Alitalia, the site appears in the minds of consumers familiar with the Italian language to offer the services of a brothel associated or affiliated with Alitalia. In this regard, plaintiff contends, the website <casinoalitalia.com> irreparably harms, tarnishes, and dilutes the goodwill, reputation, and image of the Alitalia mark.

In March of this year, Alitalia brought a four-count complaint stating claims for (i) trademark infringement, under 15 U.S.C. § 1114 et seq., against JPR (Count I); (ii) violation of the Lanham Act, 15 U.S.C. §§ 1125(a), (c), against JPR (Count II); (iii) common law unfair competition against JPR (Count III); and (iv) violation of the ACPA against JPR and <casinoalitalia.com> (Count IV). Alitalia has moved for summary judgment on all four counts. In doing so, Alitalia argues, remarkably, that the ACPA entitles it to proceed concurrently both in rem and in personam. Whether this is so presents a threshold question that must be resolved before proceeding to resolve the remaining questions of personal jurisdiction and summary judgment. JPR has entered a limited appear-

---

**3.** Since the filing of the instant action, JPR has changed the term on the first page to "Al'Italia," although the term "Alitalia" continues to be used on other pages of the website.

ance for the purpose of challenging personal jurisdiction.[4]

## II.

The ACPA creates two avenues by which claimants may seek a remedy for "cyberpiracy." The first, found in Section 1 of the ACPA, is a remedy for owners of a mark *in personam* against a person who, with "a bad faith intent to profit from that mark[,] . . . registers, traffics in, or uses a domain name" that:

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
> (III) is a trademark, work, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A). A plaintiff proceeding under Section 1 has available a full panoply of legal and equitable remedies. Specifically, such a plaintiff may seek compensatory damages, including disgorgement of defendant's profits, or elect to recover, "instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C.

§ 1117(a) & (d).[5] In addition, a Section 1 plaintiff may seek injunctive relief, including "the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C); *see Sporty's Farm LLC v. Sportsman's Market, Inc.*, 202 F.3d 489, 500 (2d Cir.2000). A mark owner's second avenue of relief is appropriately found in Section 2 of the ACPA, which provides that, where a domain name infringes a federally registered trademark or violates any right of the mark's owner under the Lanham Act, "[t]he owner . . . may file an *in rem* civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located." 15 U.S.C. § 1125(d)(2)(A). But importantly, a mark owner may file an *in rem* cause of action only where the court finds that the owner of the mark either (i) "is not able to obtain *in personam* jurisdiction over a person who would have been a defendant in a civil action under [Section 1]" ("Option I") or (ii) "through due diligence was not able to find a person who would have been a defendant in a civil action under [Section 1]" ("Option II").[6] *Id.* § 1125(d)(2)(A)(i)-(ii). Thus, the ACPA limits a court's *in rem* jurisdiction over a domain name on a finding that Option I or II exists.[7] And fur-

---

4. *See Caesars World, Inc. v. Caesars–Palace.Com*, 112 F.Supp.2d 505, 509 (E.D.Va. 2000) (noting that *"in personam* jurisdiction cannot be based merely on an appearance in an *in rem* action"); *Harrods Ltd. v. Sixty Internet Domain Names*, 110 F.Supp.2d 420, 421–23 (E.D.Va.2000) (holding that "no personal jurisdiction over the owner of the res is acquired by bringing . . . [an *in rem* ] action" under the ACPA, and a plaintiff "cannot pursue any cause of action with the potential to impose personal liability" simply by virtue of filing an ACPA *in rem* action).

5. The damages awarded may be "for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a).

6. For purposes of brevity, the term "suitable defendant" herein refers to Section 2's requirement that suit be brought against "a person who would have been a defendant in a civil action under [Section 1]"—i.e., a person who "registers, traffics in, or uses a domain name" in a way that violates the ACPA. 15 U.S.C. § 1125(d).

7. The ACPA strangely provides that the owner of a mark may "file" an *in rem* action if the court makes a finding that the requirements of either Option I or Option II are met. 15 U.S.C. § 1125(d)(2)(A). This language suggests, nonsensically, that such a finding must precede the filing of the suit. It is evident, however, that a court cannot make such a finding *before* the *in rem* action is "filed," which ordinarily means the formality of filing

ther, as a precondition to using Option II, a mark owner is required to exercise due diligence in attempting to find a suitable defendant. *See id.* § 1125(d). This attempt must include (i) "a notice of the alleged violation and intent to proceed [*in rem*] to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar," and (ii) "publish[ed] notice of the [*in rem*] action as the court may direct promptly after filing." *Id.* § 1125(d)(2)(A)(ii)(II). Only if the owner complies with these requirements *and* nonetheless fails to find a suitable defendant who may be sued *in personam* may the owner maintain an *in rem* action against the domain name. And sig-

nificantly, the relief afforded in an ACPA *in rem* action is limited to "a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of a mark." *Id.* § 1125(d)(2)(D)(i).

 These provisions, given their plain meaning,[8] compel the conclusion that the ACPA provides mark owners with two mutually exclusive avenues for relief against putative infringers. A mark owner may proceed either *in personam* against an infringer or, in certain circumstances where this cannot be done, the owner may proceed *in rem* against the domain name; a mark owner may not proceed against both at the same time.[9] This follows from

---

a complaint with the Office of the Clerk and paying applicable filing fees. This is so because such a finding must occur within the confines of a controversy between real parties. Indeed, under the terms of the ACPA, a court cannot find that the requirements of Option II have been fully met until *after* the *in rem* action is filed, for Option II requires the trademark owner to "publish[] notice of the action as the court may direct promptly *after filing* the action." *Id.* § 1125(d)(2)(A)(ii)(II)(bb). Thus, Section 1125(d)(2)(A) must be interpreted to mean that a mark owner may *maintain* an *in rem* action against a domain name only if the court finds, after suit is filed, that the requirements of either Option I or Option II are met. *Cf. Caesars World*, 112 F.Supp.2d at 505 ("[T]o force plaintiff to prove its case before filing would stand the Act on its head.").

**8.** It is well-settled that, here, as "in any case of statutory interpretation, ... [the] analysis begins with 'the language of the statute. And where the statutory language provides a clear answer, it ends there as well.' " *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (citations omitted)). Moreover, "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.' " *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership.*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)).

**9.** Alitalia's argument to the contrary mistakenly relies on Section 4 of the ACPA, which

provides that "[t]he *in rem* jurisdiction established under [Section 2] shall be in addition to any other jurisdiction that otherwise exists, whether *in rem* or *in personam.*" 15 U.S.C. § 1125(d)(4). To read Section 4, as Alitalia would, to allow a mark owner simultaneously to obtain *in personam* jurisdiction over a putative infringer and *in rem* jurisdiction over the domain name would render the detailed statutory scheme of Section 2 entirely nugatory, for this reading would allow a mark owner to bring an ACPA *in rem* action where a suitable defendant is found and subject to *in personam* jurisdiction. Simply put, to accept Alitalia's argument on the meaning of Section 4 is to assume that Congress, in adopting that Section, meant to "paralyze with one hand what it sought to promote with the other." *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 421, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). The better reading of Section 4—one that harmonizes all of the ACPA's provisions and gives effect to the Act's animating purpose—is that the Section serves to facilitate Section 2 Option II *in rem* relief by allowing a mark owner to maintain an *in rem* cause of action upon a showing that the owner through due diligence was not able to find a suitable defendant, but *in personam* jurisdiction over a suitable defendant might "otherwise exist" were such a defendant identified and found. Thus, for example, Section 4 would prevent a previously unidentified suitable defendant from attacking collaterally an *in rem* proceeding by making a showing that *in personam* jurisdiction in fact existed, notwithstanding the mark owner's inability to find the defendant through due diligence.

Alitalia similarly relies, mistakenly, on ACPA Section 3, which provides that "[t]he

the fact that the ACPA's plain language limits the use of *in rem* jurisdiction to two situations, labeled here as Options I and II, where there is no *in personam* jurisdiction over the domain name registrant. Option I allows a mark owner to proceed *in rem* only where the identity and location of the registrant or user of an infringing domain name are known, but *in personam* jurisdiction cannot be obtained over this entity. Option II deals with those situations where the registrant or user of the offending domain name cannot be found and thus simply adds that this jurisdiction may be resorted to only where an infringer cannot be identified or found. In other words, the ACPA provides for *in rem* jurisdiction against a domain name only in those circumstances where *in personam* jurisdiction is not available.[10]

Further confirmation for the conclusion that *in personam* and *in rem* jurisdictions under the ACPA are mutually exclusive is found in the different remedies available under each jurisdictional grant. Where there exists *in personam* jurisdiction over a putative infringer, a mark owner has available a full panoply of remedies, including damages and injunctive relief. *See* 15 U.S.C. § 1117(a), (d). Yet, the remedy available in the event a mark owner must proceed *in rem* is far more limited; it is restricted to the forfeiture or cancellation of the domain name or the domain name's transfer to the mark owner. *See id.* § 1125(d)(2)(D)(i).[11] Significantly, this *in rem* remedy is included in the broader set of remedies available to a plaintiff proceeding *in personam* against a putative infringer. *See id.* § 1125(d)(1)(C). In other words, where *in personam* jurisdiction exists, there is no need to proceed *in rem,* for the broader *in personam* remedies include the limited *in rem* remedy. It follows from this difference in available remedies that the *in rem* and *in personam* jurisdictional grants are exclusive and may not be simultaneously invoked or pursued by a mark owner. Indeed, to conclude otherwise would attribute a nonsensical purpose to the ACPA—namely, to provide duplicative and superfluous jurisdictional

civil action established under [Section 1] and the *in rem* action established under [Section 2], and any remedy available under such action, shall be in addition to any other civil action or remedy otherwise applicable." 15 U.S.C. § 1125(d)(3). Alitalia argues that this provision permits its *in personam* and *in rem* causes of action to coexist simultaneously. This argument is unpersuasive, as Section 3 does no more than state that the *in personam* and *in rem* relief provided by the ACPA are not the exclusive remedies for mark owners against cyberpiracy; there may, in other words, be other non-ACPA remedies. *Cf. Sporty's Farm,* 202 F.3d at 500 (noting that "nothing in the ACPA ... precludes, in cybersquatting cases, the award of damages under any pre-existing law"). This is not to say that a mark owner may simultaneously seek *all* available forms of relief. The · specific remedies that a mark owner may seek depend on the circumstances of a given case and the jurisdictional and substantive requirements of each cause of action.

**10.** This result is consistent with the settled principle that *in rem* jurisdiction is an alternative basis for jurisdiction where *in personam* jurisdiction is not available. *See generally* 4 Charles A. Wright and Arthur R. Miller,

Federal Practice and Procedure § 1070 (2d ed. 1987) ("Jurisdiction based on property most typically is invoked when one or more defendants or persons with potential claims to the property are nonresidents or jurisdiction over the person cannot be secured. In this sense the in rem or quasi-in-rem jurisdiction represents an alternative to in personam jurisdiction.").

**11.** This limitation is consistent with the extraordinary nature of *in rem* relief, which adjudicates the rights of interested parties in the res *in absentia* and therefore may raise serious due process concerns in certain circumstances. *See, e.g., Shaffer v. Heitner,* 433 U.S. 186, 206–09, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (observing that "if a direct assertion of personal jurisdiction over the defendant would violate the Constitution, it would seem that an indirect assertion of that jurisdiction should be equally impermissible" and holding that the exercise of *in rem* jurisdiction must comply with the due process requirements elucidated in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *In re Graham,* 1998 WL 473051, *4 (Bankr.E.D.Pa. Aug.3, 1998) (recognizing the "extraordinary nature" of *in rem* relief).

grants and remedies.[12]

Yet another factor pointing to the exclusivity of *in rem* and *in personam* jurisdiction under the ACPA is the statutory requirement in Option I that the mark owner, as a condition to proceeding *in rem*, must bear the burden of demonstrating the absence of *in personam* jurisdiction over a suitable defendant. Unless the ACPA's *in rem* and *in personam* jurisdictional grants are mutually exclusive, a mark owner pursuing both simultaneously would then be in the odd, if not absurd, position of proving at once the presence and absence of *in personam* jurisdiction over the putative infringer. A mark owner simply cannot simultaneously establish both (i) that *in personam* jurisdiction over a suitable defendant cannot be obtained *and* (ii) that *in personam* jurisdiction over a putative infringer can be obtained.[13]

A hypothetical scenario helps illustrate the ACPA's operation in this regard. When a mark owner becomes aware of an infringing use, the owner's first step, typically, is to ascertain the infringer's identity and location by reference to information available from the infringing website or the pertinent domain name registrant. With this information in hand, the owner must then proceed to determine whether the circumstances of Option I or II exist. In this regard, if the owner determines that the putative infringer resides, does business, or is otherwise present in any judicial district in the United States,[14] then the inquiry is ended, and the owner, in these circumstances, must proceed *in personam* against the infringer and is precluded by the ACPA from proceeding *in rem* against the offending domain name.[15]

**12.** *Cf. Hohn v. United States*, 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (cautioning that courts should be "reluctant to adopt a construction making another statutory provision superfluous").

**13.** In this regard, a mark owner may not simultaneously file an *in rem* cause of action and an *in personam* claim in the hope that one claim will survive the court's jurisdictional inquiry. Rather, a mark owner must choose prior to filing whether to proceed *in rem* against the domain name or *in personam* against a putative infringer. Of course, if a mark owner's first choice falters, the alternative may then be pursued by refiling or seeking to amend the complaint.

**14.** The ACPA does not explicitly answer the question whether a mark owner must disprove the existence of *in personam* jurisdiction over a suitable defendant in any judicial district in the United States or only in the forum where the domain name registrar is located. Although this question need not be answered here, *see infra* notes 22–27 and accompanying text, the likely answer is that the mark owner must show the absence of *in personam* jurisdiction in any judicial district in the United States. *See, e.g., Heathmount A.E. Corp. v. Technodome.Com.*, 106 F.Supp.2d 860, 867 (E.D.Va.2000) ("There are two situations in which [Option I] comes into play: first, where the registrant of the domain name is not subject to personal jurisdiction *in any U.S. court* and, second, where a domain name registrant has transferred ownership of the domain name to another individual who is not subject to personal jurisdiction.") (emphasis added). Domain name registrants may often not be located, or otherwise subject to *in personam* jurisdiction, in the judicial district of the domain name registrar. *See generally America Online, Inc. v. Huang*, 106 F.Supp.2d 848, 850–53 (E.D.Va. 2000) (describing the domain name system and the function of domain name registrars). Until 1998, for example, NSI was the sole registrar and registry administrator for the .com, .net, and .org top-level domains. Thus, requiring a mark owner merely to disprove the existence of *in personam* jurisdiction over a suitable defendant in the forum where the domain name registrar is located would allow mark owners to proceed *in rem* against the overwhelming majority of domain names registered before 1998 by entities not subject to *in personam* jurisdiction in Virginia. Indeed, such a requirement would not prevent a mark owner from bringing an *in rem* action against an identified domain name registrant located *in the same state* outside Virginia as the mark owner. Yet, this would be contrary to Congress's clear intention to provide *in rem* relief only as a last resort to mark owners otherwise unable to seek *in personam* relief. *See infra* note 16.

**15.** This is so because the mark owner will have found a suitable defendant (thus precluding *in rem* relief through Option II) over which *in personam* jurisdiction may be exercised (thus rendering Option I inapplicable). *See* 15 U.S.C. § 1125(d)(2)(A)(ii).

But Congress recognized that in many circumstances mark owners may obtain some identifying information concerning an infringer, but nonetheless may be unable to locate that entity or obtain jurisdiction over the infringer. Often these situations occur where the putative infringer is located in a foreign country and/or provided the domain name registrar with inaccurate or false identifying information. To accommodate these possibilities, Congress included Section 2 of the ACPA, so that in these circumstances, an owner could still seek a remedy—albeit a more limited one—by proceeding *in rem* against the domain name itself.[16] But, before allowing a mark owner to proceed in this extraordinary fashion, Congress required the owner to exercise due diligence in the search for the infringer. *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(II).

Because the ACPA's *in rem* and *in personam* jurisdictional grants are mutually exclusive, Alitalia may not invoke and pursue both simultaneously. Either there is *in personam* jurisdiction over JPR, in which event the *in rem* count must be dismissed and JPR then afforded an opportunity to appear and contest Alitalia's summary judgment arguments, or there is no *in personam* jurisdiction over JPR,[17] in which event Alitalia may proceed only *in rem* against the domain name <casinoalitalia.com> and Alitalia will be entitled to summary judgment if the record discloses no triable issue of fact. Thus, the next step in the analysis is to address whether JPR is subject to jurisdiction in Virginia pursuant to the Commonwealth's long-arm statute. *See* Va.Code § 8.01–328.1.

## III.

■■■ It is well-settled that the resolution of a challenge to *in personam* jurisdiction involves a two-step inquiry. *See, e.g., Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 477 (4th Cir.1993). First, a court must determine whether the particular facts and circumstances of the case fall within the reach of Virginia's long-arm statute. *See* Va.Code. § 8.01–328.1; *Bochan v. LaFontaine,* 68 F.Supp.2d 692, 697–98 (E.D.Va.1999); *DeSantis v. Hafner Creations, Inc.,* 949 F.Supp. 419, 422 (E.D.Va.1996). Second, a court must decide whether the long-arm statute's reach in the case exceeds its constitutional grasp—namely, whether the exercise of personal jurisdiction in the matter is consistent with traditional notions of

16. The Conference Report on the ACPA notes, for example, that the ACPA's *in rem* cause of action applies "where the mark owner has satisfied the court that it has exercised due diligence in trying to locate the owner of the domain name *but is unable to do so,* or where the mark owner is otherwise unable to obtain *in personam* jurisdiction over such person." H.R. Conf. Rep. No. 464 (1999) (emphasis added) (hereinafter "Conference Report"). Importantly, the Conference Report explains that the *in rem* provision is designed to alleviate the difficulty faced by trademark owners when cybersquatters "register domain names under aliases or otherwise provide false information in their registration applications in order to avoid identification and service of process by the mark owner." *Id.* In this regard, the *in rem* provision gives the mark owner a cause of action

> in those cases, where, after due diligence, a mark owner is unable to proceed against the domain name registrant *because the registrant has provided false contact informa-*

*tion and is otherwise not to be found,* or where a court is unable to assert personal jurisdiction over such person, provided the mark owner can show that the domain name itself violates federal trademark law. *Id.* (emphasis added); *see also id.* ("The *in rem* provisions of the Act accordingly contemplate that a trademark holder may initiate *in rem* proceedings in cases where domain name registrants are not subject to personal jurisdiction or cannot reasonably be found by the trademark holder.").

17. In this regard, Alitalia bears the burden of disproving jurisdiction by a preponderance of the evidence. *See Heathmount,* 106 F.Supp.2d at 862–63 (holding that "[u]nder § 1125(d)(2), a plaintiff must 'disprove' the presence of personal jurisdiction in order to proceed *in rem,*" and "bear[s] the burden to demonstrate some indicia of due diligence in trying to establish personal jurisdiction over an individual who has been identified as a potential defendant but is not subject to jurisdiction.").

fair play and substantial justice under the Due Process Clause.[18] *See Ellicott Mach. Corp.*, 995 F.2d at 477; *DeSantis*, 949 F.Supp. at 422–23. And, although at this threshold stage the plaintiff "need only make a prima facie showing of a sufficient jurisdictional basis on the basis of the complaint and supporting affidavits," the plaintiff ultimately bears the burden of proving the existence of personal jurisdiction by a preponderance of the evidence. *America Online, Inc. v. Huang*, 106 F.Supp.2d 848, 853 (E.D.Va.2000); *see Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir.1993); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989).

■ These principles, applied here, compel the conclusion that Section 8.01–328.1(A)(4) of the Virginia long-arm statute reaches JPR's contacts with Virginia and that this reach is constitutional. Section 8.01–328.1(A)(4) provides for *in personam* jurisdiction over a person (i) who causes tortious injury (ii) in Virginia (iii) by an act or omission outside of Virginia if that person (a) regularly does or solicits business in Virginia, (b) engages in any other persistent course of conduct in Virginia, or (c) derives substantial revenue from goods used or consumed or services rendered in Virginia. Here, the requirement of a tortious injury is met; trademark infringement is a tort. *See, e.g., Maritz v. Cybergold*, 947 F.Supp. 1328, 1331 (E.D.Mo. 1996) ("A violation of the Lanham Act is tortious in nature."). And, "for domain name disputes based on federal or common

law trademark infringement ..., the relevant tortious act is the use of the domain name." *America Online*, 106 F.Supp.2d at 854. Thus, insofar as JPR uses an allegedly infringing domain name by using <casinoalitalia.com> on its servers in the Dominican Republic, it commits a tortious act outside Virginia. This act, moreover, causes injury in Virginia, as it is alleged that JPR's use of <casinoalitalia.com> on the Internet (i) is likely to cause confusion, mistake, and deception of Virginia consumers and (ii) dilutes the distinctive quality of Alitalia's famous mark, and thereby damages Alitalia's business, reputation, and goodwill among Virginia consumers. Finally, JPR "engages in a persistent course of conduct in Virginia" through its maintenance of <casinoalitalia.com>, an interactive website accessible to Virginia consumers 24 hours a day.[19] Accordingly, the Virginia long-arm statute, by its terms, reaches JPR, and the next question is whether this reach comports with due process.

■ The Due Process Clause requires that no defendant be haled into court unless he has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Moreover, jurisdic-

18. Because the Virginia long-arm statute extends personal jurisdiction to the fullest extent permitted by due process, the first inquiry is often merged into the second. *See Kolbe v. Chromodern Chair Co.*, 211 Va. 736, 180 S.E.2d 664, 667 (1971); *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir.1990); *America Online*, 106 F.Supp.2d at 854. It is possible, however, for the contacts of a nonresident defendant to satisfy due process but not the requirements of the Virginia long-arm statute. *See, e.g., TELCO Communications v. An Apple A Day*, 977 F.Supp. 404, (E.D.Va. 1997); *DeSantis*, 949 F.Supp. at 423. Accordingly, consideration of the applicability of the Virginia long-arm statute is necessary.

19. *See TELCO*, 977 F.Supp. at 407 (holding that a defendant who "conduct[s] ... advertising and soliciting over the Internet, which could be accessed by a Virginia resident 24 hours a day, ... did so regularly for purposes of the long-arm statute"); *Rannoch, Inc. v. The Rannoch Corp.*, 52 F.Supp.2d 681, 684 (E.D.Va.1999) (noting that a website that "promotes and advertises its services and is accessible to Virginians 24 hours a day" satisfies Va.Code § 8.01–328.1(A)(4)); *Black & Decker (U.S.) Inc. v. Pro–Tech Power Inc.*, 26 F.Supp.2d 834, 842 (E.D.Va.1998) (holding that "defendants regularly solicit business in this state insofar as each of them advertises their products on World Wide Web sites.").

tion is only appropriate in circumstances where a defendant has purposefully directed his activities at residents of the forum, resulting in litigation that emanates from alleged injuries arising out of or relating to those activities. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). But merely because a defendant is aware "that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." [20] Rather, the defendant must have "'purposely avail[ed] itself of the privilege of conducting activities within the forum state' ... to ensure that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." [21]

No published Fourth Circuit opinion definitively addresses the exercise of personal jurisdiction in Internet domain name disputes. A majority of courts that have addressed the issue have examined "the nature and quality of activity that a defendant conducts over the Internet," and have applied the analytical "sliding scale" formulated in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997). *Bochan,* 68 F.Supp.2d at 701 (quotation omitted); *see Millennium Enters., Inc. v. Millennium Music, LP,* 33 F.Supp.2d 907, 916 (D.Or.1999) (collecting cases). The district court in *Zippo* described a continuum of three principle types of Internet jurisdiction cases. At one end of the continuum lie businesses or persons who clearly conduct business over the Internet and have repeated contacts with the forum state such that the exercise of *in personam* jurisdiction is proper. Thus, for example, "[i]f the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." *Zippo,* 952 F.Supp. at 1124. At the other end of the continuum are defendants who have done nothing more than post information or advertising on a website that is accessible to users in the forum jurisdiction. In this regard, "[a] passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." [22] The middle ground between the two poles "is occupied by interactive Web sites where a user can exchange information with the host computer," and, there, "the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* Simply put, as the level of interactivity of the website and the commercial nature of the exchange of information increase, the more reasonable it is to conclude that a defendant directed its activities purposefully at the forum state and should reasonably have foreseen being haled into court in the forum jurisdiction.

This analysis, applied here, points persuasively to the conclusion that JPR's contacts with Virginia constitute sufficient minimum contacts and purposeful

---

**20.** *Asahi Metal Indus. Co. v. Superior Court of Ca.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion); *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 944 (4th Cir.1994).

**21.** *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1987)). And, the exercise of *in personam* jurisdiction must be fair and reasonable under the circumstances of the case. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559, 62 L.Ed.2d 490.

**22.** *Zippo,* 952 F.Supp. at 1124; *see, e.g., Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336–37 (5th Cir.1999) (denying jurisdiction where defendant maintained only a passive website). *But see Maritz,* 947 F.Supp. at 1333 (finding jurisdiction where defendants "consciously decided to transmit advertising information to all Internet users, knowing that such information will be transmitted globally").

availment to satisfy due process requirements. First, <casinoalitalia.com> provides intense real-time interactivity to its members; indeed, the product that JPR markets and provides through <casinoalitalia.com>—namely, online casino gambling—is an inherently interactive activity. Moreover, the provision of this product necessarily requires JPR to enter into contracts with <casinoalitalia.com> members, who must purchase "credits" in order to play individual games.[23] *See, e.g., Millennium Enters.,* 33 F.Supp.2d at 916 (noting that "courts generally have exercised jurisdiction in cases ... where the defendant 'conducted business' over the Internet by engaging in repeated or ongoing business transactions with forum residents or by entering into a contract with plaintiff through the Internet"). This makes clear that JPR's website is not merely a passive website, placed into the stream of Internet commerce and not purposefully directed at Virginia or its residents, but rather is a website that interacts with Virginia consumers to such degree as to put JPR on notice that it is purposefully directing its activities at Virginia and its residents.[24] Second, the record discloses that Virginia residents have visited, joined, and played games on casinoalitalia.com. Of the 750 members of the online gambling website, five have provided billing addresses in Virginia.[25] Defendants' contacts with these residents are sufficient to put JPR on notice that it is purposefully directing its activities at Virginia, and that it should therefore foresee being haled into court in this forum.[26]

*Thompson v. Handa–Lopez, Inc.,* 998 F.Supp. 738 (W.D.Tex.1998), is closely analogous. There, the plaintiff, a Texas resident, brought suit against a California defendant that operated an arcade website on the Internet from California. The defendant argued that personal jurisdiction did not exist in that case because it was a California corporation with its principal place of business in California, and its server was located in California. Nor did the defendant maintain an office in Texas or have a sales force or employees in the state. The plaintiff argued, however, that

**23.** The website's official rules and regulations provide that opening an account, use and reuse of an account, participation in the games, or acceptance of any winnings contractually binds each member to the rules, regulations, terms, and conditions of the website. *See* Official Rules and Regulations, <http://www.casinoalitalia.com/rules.htm>.

**24.** Here, for example, <casinoalitalia.com> clearly goes beyond the level of passivity held insufficient to support *in personam* jurisdiction in *Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996), *aff'd,* 126 F.3d 25 (2d. Cir.1997). In *Bensusan,* the court found that neither the New York long-arm statute nor the Due Process Clause permitted jurisdiction in New York over the defendant, who operated a website promoting a small jazz club in Missouri. Because the website at issue was clearly directed at Missouri residents and the defendant neither encouraged New York residents to access the site, nor had other contacts in New York, where the plaintiff operated the famous New York City jazz club, "The Blue Note," the court held that the defendant's creation of the website, "like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward the forum state." *Id.* at 301.

**25.** JPR admits to receiving $264.80 in 2000 from these five members, although the record does not show the magnitude of gambling winnings or losses by Virginia members in that year or in other years.

**26.** *See, e.g., Park Inns Int'l v. Pacific Plaza Hotels, Inc.,* 5 F.Supp.2d 762, 764–65 (D.Ariz. 1998) (finding purposeful availment from defendant's operation of an interactive website and acceptance of hotel reservations from forum residents through the website); *American Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F.Supp. 494, 498–99 (S.D.N.Y.1997) (holding that, while "arguably a defendant should not be subjected to jurisdiction in New York simply because its home page could be viewed by users there," due process requirements were met because defendant entered into contracts with New York residents related related to plaintiff's cause of action for trademark infringement).

the defendant had sufficient minimum contacts with Texas because the defendant "advertised its Casino over the Internet knowing that Texas citizens will see its advertisement," and because defendant actually "conducted business within the state of Texas by entering into contracts with Texas citizens to play those games, which Texas citizens played while in Texas." *Id.* at 743. In the end, the district court found sufficient contacts with the forum state to justify the exercise of *in personam* jurisdiction because (i) the defendant "continuously interacted with casino players [by] entering into contracts with them as they played with various games"; (ii) the defendant "entered into contracts with the residents of various states knowing that it would receive commercial gain at the present time"; (iii) the plaintiff "played the casino games while in Texas, as if they were physically located in Texas"; and (iv) the defendant would have sent any money won to the plaintiff's Texas address. *Id.* at 744. Here, too, JPR continuously interacted with Virginia <casinoalitalia.com> members and entered into contracts with them with the knowledge that it was receiving commercial gain in exchange for the provision of interactive online casino games. These Virginia members undoubtedly played the games in Virginia as if they were at a casino in Virginia, and any winnings earned would have been sent to Virginia. As in *Thompson,* therefore, the nature and extent of JPR's contacts with Virginia and its residents are sufficient to satisfy the requirements of due process.

Accordingly, because JPR is subject to *in personam* jurisdiction in Virginia, Alitalia cannot maintain its ACPA *in rem* cause of action against <casinoalitalia.com>. Nor is Alitalia entitled to summary judgment on the current record, for JPR must now be offered and opportunity to file a responsive pleading pursuant to Rule 12, Fed.R.Civ.P.,[27] and, at the appropriate time, to respond to Alitalia's summary

judgment motion, should this motion be renewed.

An appropriate Order shall issue.

---

**27.** Of course, JPR is not entitled to file another motion challenging personal jurisdiction, as it has already had an opportunity to con-

test the issue in the course of its limited appearance.