REVISED May 2, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 7, 2008

Charles R. Fulbruge III
Clerk

No. 07-41232

VELKIS JOHNSTON; NATASHA CHANDLER; MINERVA CHANDLER; WALTER CHANDLER; CECILIA CRUZ NAVARRO DE VERGARA; ET AL

Plaintiffs - Appellees

v.

MULTIDATA SYSTEMS INTERNATIONAL CORP; MDS NORDION INC; MDS CANADA INC; MDS INC

Defendants - Appellants

Appeal from the United States District Court for the
Southern District of Texas, Galveston

Before KING, STEWART, and PRADO, Circuit Judges.

KING, Circuit Judge:

Defendants-appellants Multidata Systems International Corp., MDS Inc., MDS (Canada) Inc., and MDS Nordion Inc. (collectively "Defendants") appeal the district court's interlocutory order refusing to dismiss this case: (1) for lack of personal jurisdiction; (2) as barred by the doctrines of res judicata and direct estoppel; and (3) for forum non conveniens. Because we find that Texas cannot exercise general jurisdiction over Defendants, and the plaintiffs-appellants

("Plaintiffs") do not allege that specific jurisdiction exists, we reverse the district court's order. We do not consider the remaining issues.

I.

This is the third suit that Plaintiffs have brought in the United States against Defendants, Multidata Systems International Corp. ("Multidata"), a Delaware corporation with its principal place of business in St. Louis, Missouri, and three Canadian corporations, MDS Inc. ("MDS"), MDS (Canada) Inc. ("MDS Canada"), and MDS Nordion Inc. ("MDS Nordion"), for personal injuries to themselves or their decedents. Plaintiffs or their decedents were cancer patients who received radiation therapy at the Instituto Oncologico Nacional ("ION") in Panama City, Panama, between August and December 2000. During this time, they were over-exposed to radiation, resulting in serious injuries and several deaths. Most of the plaintiffs are citizens and residents of Panama, although Plaintiffs claim that six of the surviving representatives are citizens or authorized residents of the United States. Not one of the injured plaintiffs or decedents is a Texas resident.

Plaintiffs or their decedents were treated at ION with a Theratron 780C Teletherapy Unit ("Theratron Unit") in conjunction with a Treatment Planning System ("TPS"). The Theratron Unit is a cancer-treating radiation device that delivers therapeutic Cobalt radiation to cancer patients. It was originally designed and manufactured by Theratronics International Ltd. ("Theratronics"), a Canadian corporation. The unit in use at ION was, in fact, sold by Theratronics in 1992. In 1998, however, the Canadian Development Investment Corporation sold Theratronics to MDS, which, in turn, sold Theratronics to its wholly-owned subsidiary, MDS Nordion. In 2001, MDS Nordion ceased to exist as a corporate entity when it merged with MDS Pharma Services, Inc., another wholly-owned subsidiary of MDS, to form MDS Canada.

The TPS, meanwhile, is a stand-alone computer and software system manufactured by Multidata. It is used to assist physicists in calculating radiation dosages, distribution, and treatment times for cancer patients. The TPS considers numerous factors in making its calculations, including the prescription from the doctor, the distance the patient is located from the radiation source, the depth of the tumor being treated, and the number of "shielding blocks" used in conjunction with the radiation treatment. A shielding block is a material designed to shape the radiation beam to protect a patient's healthy organs and sensitive tissue. The TPS was designed to perform calculations using up to four shielding blocks.

In or around August 2000, one of the radiation oncologists at ION requested a treatment plan that used five shielding blocks. Although the TPS was not designed to calculate the proper level of radiation dosages under such circumstances, ION doctors and physicists determined that they could manipulate the data entry procedure by making it appear that five shielding blocks were actually one shielding block. Unfortunately, when the data was entered into the TPS using this new method, the dose calculation was incorrect. As a result, an over-dosage of radiation was prescribed, sometimes in excess of twice the amount of radiation that should have been administered.

Once the effects of the over-radiation surfaced, the government of Panama requested separate investigations by the International Atomic Energy Association ("IAEA") and a group of physicians and physicists from M.D. Anderson Cancer Center ("M.D. Anderson") in Houston, Texas. Both the IAEA and the M.D. Anderson doctors published reports explaining their understanding of the events leading to the over-radiation. Both reports concluded that the patients received excess radiation because the TPS was erroneously re-configured to calculate the amount of radiation necessary when using five shielding blocks. In addition, the ION doctors and physicists were faulted for

failing to: (1) manually verify the TPS's calculations; or (2) simulate treatment plans by irradiating a water phantom and measuring the dosage. Moreover, ION staff were faulted for failing to compare the newly calculated dosage levels to similar prior treatments and failing to detect early symptoms of excessive radiation exposure in the patients being over-exposed to radiation by the new treatment plan.

Ultimately, as a result of these and other investigations, the ION doctors and physicists that caused Plaintiffs' over-radiation were sanctioned or prosecuted to varying degrees by the Panamanian government. An ION radiation oncologist and three physicists lost their licenses to practice medicine in Panama. In addition, two of the three physicists were criminally convicted in Panama of negligent homicide.

On October 17, 2001, Plaintiffs filed a lawsuit in the Circuit Court of the County of St. Louis, Missouri, against Defendants. Plaintiffs alleged that they suffered from the effects of excess radiation because the Theratron Unit and TPS were defective. They sought damages for wrongful death and negligence. Defendants immediately moved for dismissal on forum non conveniens grounds, arguing that the case should be heard in Panama where most of Plaintiffs lived, where the Plaintiffs or their decedents were injured, and where most of the witnesses and evidence were located. Plaintiffs responded that Missouri was a convenient forum because Multidata was located there. Moreover, Plaintiffs argued that Panama was not an available alternative forum because: (1) Panama's judicial system was corrupt; and (2) Panama would not accept jurisdiction over a case previously dismissed from a foreign jurisdiction. After permitting discovery, the state trial court held a three day evidentiary hearing to determine whether the action should be dismissed. Both Plaintiffs and Defendants presented expert testimony concerning the availability of Panama as an alternative forum.

Before the Missouri trial court reached a decision, however, one of the Plaintiffs filed a petition in the San Miguelito Judicial District Court of Panama against Defendants. Before Defendants were served with the petition or otherwise notified of the filing, the Panamanian court dismissed the case for want of jurisdiction. Plaintiffs notified the Missouri trial court of this outcome and sought to rely on the dismissal from the Panamanian court to prove that Panama was not an available alternative forum. Defendants objected to the consideration of the ruling, claiming that the case was filed in the wrong venue and that they were never given the opportunity to waive jurisdictional defects.

On January 8, 2004, the Missouri trial court granted Defendants' motion to dismiss without prejudice in a brief order on forum non conveniens grounds. The state trial court explicitly ruled that Plaintiffs could re-file in Missouri if Panama refused jurisdiction, stating:

> [r]econsideration may be given to the refiling of this cause in this jurisdiction if a determination is made by a Panamanian court of competent jurisdiction and venue for this cause that jurisdiction does not exist in Panama and the Defendants were given the opportunity to submit to the jurisdiction of the Panamanian court or were given notice of such filing so as to be able to present their position to the court on the issue of jurisdiction.

Chandler v. Multidata Sys. Int'l Corp., No. 01CC-3634, slip op. at 2 (Mo. Cir. Ct. Jan. 8, 2004) (emphasis added).

Plaintiffs appealed the state trial court's decision to the Missouri Court of Appeals for the Eastern District of Missouri. On May 10, 2005, the Missouri Court of Appeals affirmed the decision in a published opinion. Chandler v. Multidata Sys. Int'l Corp., 163 S.W.3d 537 (Mo. Ct. App. 2005). Amongst other holdings, the Missouri Court of Appeals upheld the trial court's finding that Panama was an available alternative forum because Defendants proved that a dismissal from a foreign jurisdiction would not prohibit re-filing in Panama. Id. at 546-49. The Missouri Court of Appeals distinguished Plaintiffs' case from

Canales Martinez v. Dow Chemical Co., 219 F. Supp. 2d 719 (E.D. La. 2002), where a federal district court found that Costa Rica was not an available forum because Costa Rica barred litigants from filing cases dismissed from foreign courts for forum non conveniens. Chandler, 163 S.W.3d at 547-48. The Missouri Court of Appeals stated that "unlike the plaintiffs in Canales, Plaintiffs fail to demonstrate which sections of Panama's Judicial or Civil Codes prohibit Plaintiffs from re-filing this cause of action in Panama." Id. at 547.

Plaintiffs neither appealed to the Missouri Supreme Court nor re-filed in Panama. Instead, Plaintiffs filed four new cases in the Circuit Court of the County of St. Louis, Missouri. Plaintiffs argued that they had complied with the original Missouri court order because the Panamanian Court of Appeals subsequently affirmed the dismissal of the San Miguelito action. In response, Defendants moved to dismiss, arguing that they were not given the opportunity to be heard before the Panamanian trial court or to waive jurisdictional objections. On March 16, 2006, the four consolidated cases were dismissed by the Missouri trial court, which stated that:

> Plaintiffs have not proven that this cause cannot be litigated in Panama. Plaintiffs have previously filed their claims in Panama and in this Court. Both jurisdictions dismissed the cases. Plaintiffs' filing was not with the proper Panamanian Court. In addition, the law of the case doctrine herein, as well as, parts of the doctrine of res judicata apply to require plaintiffs to re-file these claims in Panama. If Panama refuses to proceed, the claims can be refiled in Missouri. Cause is dismissed without prejudice.

Navarro v. Multidata Sys. Int'l Corp., No. 05CC-3136, slip op. at 2 (Mo. Cir. Ct. Mar. 16, 2006).

On May 15, 2006, rather than filing in Panama, Plaintiffs filed the instant suit in the United States District Court for the Southern District of Texas,

Galveston Division.[1]   Plaintiffs' claims were essentially the same as those brought in the Missouri state actions, including, amongst others, counts for wrongful death and personal injuries caused by negligent design and manufacturing of the Theratron Unit and the TPS.  On July 5, 2006, Defendants separately moved to dismiss the case for lack of personal jurisdiction, as barred by the doctrines of res judicata and direct estoppel, and on forum non conveniens grounds.  Defendants argued that the case was barred because the Missouri state courts' decisions precluded Plaintiffs from litigating the case in the United States.  Before Plaintiffs filed a response, at an August 2, 2006, scheduling hearing, the district court ordered that discovery be conducted into the issues.

On February 9, 2007, after conducting discovery, Defendants re-moved to dismiss this case for lack of personal jurisdiction, as barred by the doctrines of res judicata and direct estoppel, and for forum non conveniens. In response, Plaintiffs argued that:  (1) the district court could exercise general jurisdiction over Defendants; (2) the Missouri state courts' decisions were not res judicata because the decisions merely prohibited Plaintiffs from re-filing in Missouri; and (3) the case could not be dismissed for forum non conveniens because Panama was not an available alternative forum.

On April 30, 2007, the district court denied the motions to dismiss without holding an evidentiary hearing, holding that Defendants had sufficient continuous and systematic contacts with Texas such that general jurisdiction existed.  Moreover, the district court held that the Missouri trial courts' dismissals for forum non conveniens were not res judicata in a Texas federal

---

[1] On May 26, 2006, four of the plaintiffs finally re-filed their claims in a Panamanian Court, namely, the Judicial District Court for Panama City, Panama.  Once again, however, the case was promptly dismissed, and Defendants were again unable to waive any jurisdictional defects because the petition was not served upon Defendants until after the suit was dismissed.  Defendants allege that this lawsuit was dismissed because it was filed in the wrong venue and, below, argued that the petition was not filed in good faith because a large portion of it argued that the Panamanian court lacked any jurisdiction.

court because the convenience of litigating the case in Missouri was different than the convenience of litigating the case in Texas. Finally, the district court refused to dismiss the case for forum non conveniens because Panama was no longer an available forum. On August 1, 2006, the Panamanian National Assembly had enacted Panamanian Assembly Law No. 32, chapter 4, § 2, article 1421-J ("Article 1421-J"), which stated that: "Lawsuits that are brought in the country as a result of a foreign judgment of forum non conveniens, impede national competence from being generated. Therefore, they must be rejected ex officio by reason of incompetence for constitutional order reasons or for preventive competence provisions." (Translation by M. Delgado Debali, Certified Pub. Translator, Aug. 4, 2006). While the constitutionality of this law was immediately challenged by the Panamanian Attorney General in the Panamanian Supreme Court, a decision had not been rendered, and the district court was unwilling to overlook positive Panamanian law.[2]

On May 14, 2007, Multidata and the Canadian defendants filed separate motions requesting that the district court certify portions of its April 30, 2007, order for interlocutory appeal under 28 U.S.C. § 1292(b), including the denial of Defendants' motions to dismiss for lack of personal jurisdiction and as barred by the doctrines of res judicata and direct estoppel. In addition, the Canadian defendants moved to certify the forum non conveniens decision. Plaintiffs opposed the motions and, on July 11, 2007, the district court denied the motions because the "case [was] not momentous enough to justify an unwarranted intrusion into the [Fifth] Circuit's time." However, on November 14, 2007, the district court sua sponte reconsidered the motions for interlocutory appeal, vacated the order denying the motions, and certified the April 30, 2007, order for

---

[2] During oral argument, we were informed that the Panamanian National Assembly has since repealed Article 1421-J. Because we decide this case on personal jurisdictional grounds, we do not have to weigh the effect of this repeal on our review of the district court's res judicata or forum non conveniens decisions.

immediate appeal. Accordingly, Multidata and the Canadian defendants filed petitions for permission to appeal with this court.

On December 12, 2007, a panel of this court granted the petitions. We need only consider the personal jurisdiction question to resolve the case.

II.

The plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident, but it need only make a prima facie case if the district court rules without an evidentiary hearing. Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994) (citations omitted). Proof by a preponderance of the evidence is not required. Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990) (citing D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc., 754 F.2d 542, 545-46 (5th Cir. 1985)). "'Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists.'" Id. (quoting D.J. Invs., Inc., 754 F.2d at 546). We review the personal jurisdiction question here de novo. See Wilson, 20 F.3d at 647-48 (citation omitted).

A "federal court sitting in diversity may assert jurisdiction if (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the fourteenth amendment to the United States Constitution." Cycles, Ltd. v. W. J. Digby, Inc., 889 F.2d 612, 616 (5th Cir. 1989). A district court must determine whether both the forum state's long-arm statute and federal due process permit the court to exercise personal jurisdiction. Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 418 (5th Cir. 1993) (citations omitted). Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis. See Wilson, 20 F.3d at 647 (citations omitted). Federal due process

requires a plaintiff to prove: (1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the state; and (2) that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." Id. at 647 (quotations and citations omitted).

"There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001). In this case, Plaintiffs do not contend that specific jurisdiction exists over Defendants. We, therefore, focus solely on general jurisdiction, which exists when a non-resident defendant's contacts with the forum state are substantial, continuous, and systematic. Helicopteros Nacionales De Colombia, S.A. v. Hall, 466 U.S. 408, 414-19 (1984); Religious Tech. Ctr. v. Liebreich, 339 F.3d 369, 374 (5th Cir. 2003) (citations omitted). The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." Submersible Sys., Inc. v. Perforadora Cent., S.A., 249 F.3d 413, 419 (5th Cir. 2001) (citation omitted). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction . . . ." Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002) (citations omitted). "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309, 312 (5th Cir. 2007) (citation omitted).

"General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717 (5th Cir. 1999) (citation omitted). The contacts must be reviewed in toto, and not in isolation from one another. Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 779 (5th Cir. 1986); see also Religious Tech. Ctr., 339 F.3d at 374 (citations omitted)

("None of the activities individually constitutes a substantial or meaningful contact with Texas, Texas law, or Texas residents, and certainly considered in toto they fail to amount to continuous and systematic contact with Texas such that general jurisdiction is created."). But vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction. See Gardemal v. Westin Hotel Co., 186 F.3d 588, 596 (5th Cir. 1999).

Before we apply these principles to this case, it is worthwhile to review past cases to illustrate just how difficult it is to establish general jurisdiction. The seminal general jurisdiction case is Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437 (1952). There, the Supreme Court upheld the district court's exercise of general personal jurisdiction in Ohio over a Philippine corporation whose president and general manger relocated to Ohio during the Japanese occupation of the Philippine Islands. Id. at 447-49. While in Ohio, the president maintained a corporate office where he kept the records of the corporation, conducted director's meetings, and made all key business decisions. Id. at 447-48. The corporation also distributed salary checks drawn on two Ohio bank accounts and engaged an Ohio bank to act as a transfer agent. Id. at 448. In light of these activities, the Court held that Ohio could exercise jurisdiction over the corporation because the president had "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." Id.

By contrast, in Helicopteros, the Supreme Court found that the defendant's contacts with Texas were insufficient to support an exercise of general jurisdiction. 466 U.S. at 418-19. The defendant's contacts with Texas in that case were in some sense extensive. For example, over a six year period the defendant: purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from a Texas company; sent its

prospective pilots to Texas for training; sent management and maintenance personnel to Texas for technical consultations; and received a check for over $5 million that was drawn upon a Texas bank. Id. at 411. Nevertheless, the Court held that none of the contacts was substantial enough standing alone or taken together. See id. at 416-19. The mere purchase of goods from a state, even at regular intervals and in amounts that were not insubstantial, was not enough to warrant the assertion of jurisdiction over a non-resident in a cause of action unrelated to those purchases. Id. at 417-18. Nor did the fact that the defendant sent personnel into Texas for training in connection with the purchases in any way enhance the nature of the contacts—this was merely one aspect of the package of goods and services that the defendant had purchased. Id. at 418. Finally, the receipt of a check drawn from a Texas bank was of no consequence because the bank from which payment was made was caused by the fortuitous "unilateral activity" of a third party. Id. at 416-17 (citations omitted).

This circuit has consistently imposed the high standard set by the Supreme Court when ruling on general jurisdiction issues. See, e.g., Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received interline shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts); Wilson, 20 F.3d at 651 ("Even if [the defendant's] contacts with Texas via his short-lived malpractice insurance arrangement through a Texas law firm and his multi-year pro bono association with the historical society were arguably continuous, we hold that they were not substantial enough to warrant the imposition of general personal jurisdiction over [him]."); ASARCO, Inc. v. Glenara, Ltd., 912 F.2d 784, 787 (5th Cir. 1990) (holding that sporadic contacts with Louisiana were insufficient to cause the defendant to reasonably anticipate the possibility of being haled into court in Louisiana); Bearry v. Beech Aircraft

Corp., 818 F.2d 370, 373-76 (5th Cir. 1987) (holding that the sale of over $250 million of products to seventeen Texas customers over a five year period did not constitute systematic and continuous contacts with Texas because delivery was accepted in Kansas).

Moreover, in Access Telecom, we emphasized that in order to confer general jurisdiction a defendant must have a business presence in Texas. 197 F.3d at 717. It is not enough that a corporation do business with Texas. Id. Thus, in that case, it was not sufficient to prove that the Mexican defendant leased telephone circuits and real property in Texas. Nor was the fact that the defendant derived millions of dollars a month in revenue from telephone calls made by Texas residents. Id. Since the purpose of the defendant's contacts with Texas was to effectuate the Mexican leg of a telephone call, any money received from United States companies was for "service on the Mexican leg of the telephone call . . . ." Id. By contrast, United States carriers received the monies derived from the United States leg of the call. Id. "As such, [the defendant] and U.S. telecommunications companies do business with each other in these situations, but neither is doing business in the other country for jurisdictional purposes." Id. (emphasis in the original).

In the instant case, it is quite clear that Multidata does not have sufficient systematic and continuous contacts with Texas to establish general jurisdiction. Plaintiffs put forward only three bases for jurisdiction. First, over a period of five years, Multidata sold approximately $140,000 worth of goods and related service contracts to ten different customers located in Texas. Those sales represented approximately three percent of Multidata's business during that time span, and resulted in periodic trips by Multidata employees into Texas to service the equipment. Second, Multidata advertised in national trade journals whose circulation reached Texas. And, third, Multidata employees periodically attended trade conventions in Texas. In response, Multidata stresses that it neither

maintains a place of business in Texas nor has a registered agent for service of process in Texas. It argues that the contacts identified by Plaintiffs are too limited and sporadic to give rise to general jurisdiction. We agree.

In Alpine View Co. v. Atlas Copco AB, we held that general jurisdiction did not exist where the "evidence show[ed], at best, that [the defendant] sold, on isolated occasions, products to entities located in Texas, . . . that companies used [the defendant's] products for projects in Texas, and that [the defendant's] personnel made field visits to Texas between December 1992 and December 1993." 205 F.3d 208, 218 (5th Cir. 2000). Likewise, neither Multidata's sale of approximately $140,000 worth of goods in a five-year time period to Texas customers nor its employees' occasional travels to Texas to service equipment or attend trade conventions are sufficient to justify exercising general jurisdiction. See also Cent. Freight Lines, Inc., 322 F.3d at 381. Moreover, advertising in national trade journals is not a substantial contact with Texas. Bearry, 818 F.2d at 376 (citation omitted). In short, the nature and quality of Multidata's contacts are too insignificant and sporadic to "constitute a general presence in the state." See Dalton v. R&W Marine, Inc., 897 F.2d 1359, 1362 (5th Cir. 1990) (holding that the defendant did not have a general presence in the forum state despite earning over twelve percent of its revenue from sales in the state).

Similarly, MDS's contacts with Texas are lacking the substance or regularity necessary to establish general jurisdiction. Plaintiffs identify four different contacts that MDS has with Texas: (1) it purchased over $5.2 million worth of goods from Texas vendors during the five year period prior to the lawsuit; (2) it is party to a Hosting Services Agreement and a Software Licensing Agreement with a Texas corporation that is governed by Texas law; (3) it employs two Texas residents who perform work from their homes in Texas; and (4) a former corporate director lived in Texas. In response, MDS notes that it: (1) has not manufactured or sold any products in Texas; (2) owns no real property in

Texas; (3) does not have a registered agent for service of process in Texas; and (4) does not maintain any offices in Texas. Moreover, it argues that the contacts identified by Plaintiffs are insufficient to establish a systematic and continuous contact with Texas. Once again, we agree.

First, the Supreme Court has already determined that purchases of goods from Texas vendors, standing alone, are not the type of contacts that will establish general jurisdiction. See Helicopteros, 466 U.S. at 417 ("[P]urchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction."). We, therefore, can give only minimal weight to the fact that MDS purchased $5.2 million worth of goods (a mere one percent of its component parts) from Texas vendors. Similarly, the fact that MDS entered into a Hosting Services Agreement with a Texas company adds little to the analysis. Although it is true that the software license is subject to Texas law, any other disputes arising under the agreement are governed by New York law. In reality, the contract represents nothing more than another example of MDS purchasing goods and services from a Texas vendor—a contact that is not sufficient to form the basis for general jurisdiction. See id; see also Access Telecom, 197 F.3d at 717 n.6 (stating that a contact that involved paying for services that were provided by Texas residents adds little to the analysis).

Nor are we convinced that MDS, which has not sold goods or services in Texas, has a general business presence in the state based on the residence of two employees and a former director. The two employees are Bill Lloyd, a product test manager in the area of product development, and Robert Deutschman, a software developer. Neither employee works with Texas customers. Both employees work from home and report to supervisors located in Toronto, Canada. And both became employees through the happenstance of an acquisition, not because they resided in Texas. They were permitted to remain in Texas because they were able to perform their jobs anywhere in the world. While their presence

is certainly a regular contact with Texas, it is not substantial enough to create a general business presence in Texas. See Access Telecom, 197 F.3d at 717 (holding that a presence in Texas is not sufficient unless the defendant is doing business in Texas); Ratliff v. Cooper Labs., Inc., 444 F.2d 745, 746-48 (4th Cir. 1971) (finding no general jurisdiction despite the fact that the defendant had five employees located in the forum state). Furthermore, the fact that a former corporate director resided in Texas is not enough absent a more meaningful business presence. Cf. Holt Oil & Gas Corp., 801 F.2d at 779 (citation omitted) (stating that an individual's status as a director of a Texas corporation would not alone be sufficient to create general jurisdiction in Texas). Unlike in Perkins, the business director here did not conduct board business in Texas. He merely resided there. See also Religious Tech. Ctr., 339 F.3d at 374 (holding that a Florida estate did not have systematic and continuous contacts with Texas despite the fact that a representative of the estate conducted some estate business from her home in Texas—including signing her retainer letter in Texas, receiving and distributing property in Texas, and participating in decisions concerning estate litigation in Texas). Taken in toto, MDS's contacts with Texas are not so substantial that it "should have reasonably expected to be sued in Texas on any matter, however remote from [those] contacts." Wilson, 20 F.3d at 650.

MDS Canada's contacts with Texas, although more substantial than the other defendants, also fail to create general jurisdiction.[3] Plaintiffs identify two major types of contacts. The first category is clinical trial work for pharmaceutical companies (referred to as "sponsors" by MDS Canada), which

---

[3] For this reason, MDS Nordion, which merged with MDS Pharma Services, Inc., to form MDS Canada, also does not have sufficient contacts with Texas such as to create general jurisdiction. See Engel v. Teleprompter Corp., 703 F.2d 127, 131 (5th Cir. 1983) (citations omitted) ("A merger of two corporations contemplates that one corporation will be absorbed by the other and will cease to exist while the absorbing corporation remains.").

16

sometimes include contracts governed by Texas law. The clinical trial work at issue generally involves both in-house testing services and the coordination and design of trials carried out by independent physicians. MDS Canada's contacts with Texas that arise from this work are twofold: (1) work done on behalf of Texas pharmaceutical companies; and (2) clinical trial work performed by independent physicians located in Texas, which is coordinated by MDS Canada. The record is unclear as to the total amount of money involved in these transactions. However, MDS Canada receives less than one percent of its testing revenue from Texas customers, and less than ten percent of its contracts with independent testing facilities are with doctors located in Texas.

The second category involves the sale of products and related services to Texas customers. The products include large and expensive medical equipment, such as Theratron units similar to the one at issue in this case, and Gammacell and Raycell irradiators, which sterilize donated blood to prevent the spread of disease through transfusions. MDS Canada has sold only a few of these items to Texas customers in the five years preceding this case. It sold no Theratron units (as opposed to one hundred twenty-six worldwide) and only ten Gammacell and Raycell irradiators (as opposed to three hundred seventeen worldwide). On the other hand, MDS Canada also manufactures smaller and higher-volume products, including radioisotope devices that are used for medical imaging. It is unclear exactly how many of these products were sold to Texas customers. However, when added to the sale of the large radiation devices, and including customer service trips, MDS Canada sold a total $5,736,931, $1,494,263, $3,710,162, $6,164,747, and $8,751,805 worth of products to Texas customers in the years of 2002, 2003, 2004, 2005, and 2006, respectively. For four out of five years this accounted for 1.7%, 0.5%, 1.1%, and 2.5% of MDS Canada's total global sales.

We do not believe that these various activities amount to substantial, systematic, and continuous contacts. MDS Canada is not registered to do business in Texas; does not own, possess or use property in Texas; does not maintain a mailing address or bank account in Texas; and does not keep, maintain or store any documents within Texas. While it is true that MDS Canada sells products and services to Texas customers, neither the total amount of sales nor the percentage of annual sales is substantial or regular enough to create a general presence in Texas. See Access Telecom, 197 F.3d at 717-18 (finding no general jurisdiction where the defendant derived millions of dollars a month in revenue from Texas residents); Siemer v. Learjet Acquisition Corp., 966 F.2d 179, 181-84 (5th Cir. 1992) (holding that general jurisdiction did not exist over a Delaware corporation where the corporation sold slightly over one percent of its products to Texas buyers); Dalton, 897 F.2d at 1362 (holding that the defendant did not have a general presence in the forum state despite earning over twelve percent of its revenue from sales in the state). Moreover, it is of little consequence that independent clinical testing is performed by some doctors in Texas—receiving services from Texas vendors in this sense is not a significant contact. See Access Telecom, 197 F.3d at 717 n.6.

Nor do we find other less substantial contacts offered by Plaintiffs to affect our analysis. Plaintiffs note that MDS Canada sends its employees to Texas to service equipment. For example, in 2006, MDS Canada employees installed three machines, made nine services calls, and took approximately five trips into Texas for preventative maintenance. But as we noted above, mere travel, even at regular intervals into a state, does not create general jurisdiction. See Helicopteros, 466 U.S. at 418. Plaintiffs also claim that MDS Canada has an employee who permanently resides in Texas. MDS Canada disputes this point, and argues that he is merely an employee of an affiliate. Regardless, the evidence shows that in the past three years he has performed only thirty-seven

days of technical work (installing and servicing irradiators) in Texas. This amounts to little more than a random contact, and is hardly systematic and continuous. See Religious Tech. Ctr., 339 F.3d at 374. Finally, Plaintiffs rely on the fact that MDS Canada maintains a Texas Radioactive Material License, which permits it to install and remove radioactive material from irradiators located at customer sites in Texas. Never before have we held that licenses to do work can create general jurisdiction. Cf. Cent. Freight Lines, Inc., 322 F.3d at 381 (holding that general jurisdiction did not exist even though the defendant had federal operating authority in Texas); Siemer, 966 F.2d at 182 (stating that being qualified to do business in the forum state is not entitled to any special weight in evaluating general jurisdiction).

We further believe that even if MDS Canada had continuous and systematic contacts with Texas (which, in our view, it does not), traditional notions of fair play and substantial justice would be violated if we exercised jurisdiction over it in this case. If the required minimum contacts are shown, jurisdiction exists unless the defendant can make a "compelling case" that traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction. Wein Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). To evaluate the reasonableness of exercising jurisdiction, we normally consider: (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the shared interest of the several states. Bearry, 818 F.2d at 377 (citation omitted). "It is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." See Wien Air Alaska, 195 F.3d at 215 (citation omitted). "The relationship between the defendant and the forum must be such that it is reasonable to require the defendant to defend the particular suit which

is brought there." Guidry v. U.S. Tobacco Co., 188 F.3d 619, 630 (5th Cir. 1999) (citation omitted).

However, when foreign defendants are involved we must "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the [forum state]." Asahi Metal Indus. Co. v. Superior Court of Ca., 480 U.S. 102, 115 (1987) (emphasis in the original). The interests of foreign nations,

> as well as the Federal interest in Government's foreign relations policies, [are] best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."

Id. (citing United States v. First Nat'l City Bank, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)).

In Asahi, the Supreme Court held that jurisdiction would be unreasonable due to the burden on the foreign defendant. Id. at 116. That case originally involved a product liability action brought in California state court against a Taiwanese manufacturer of motorcycle tires. Id. at 105-06. However, the underlying lawsuit was eventually settled, leaving only the Taiwanese manufacturer's cross-complaint seeking indemnification from the Japanese corporation that manufactured a component of the tire's tube. Id. at 106. All of the transactions between the two corporations occurred abroad, and the Japanese defendant had no connection to California other than the fact that its products were incorporated into tires later sold in California by third parties. Id. at 106-08. The Court famously split over whether California could exercise jurisdiction over the Japanese corporation under a stream of commerce theory, absent any

additional evidence that it had purposefully directed its product towards California. Id. at 112-13, 116-22. Yet a unanimous Court agreed that, regardless, it would be unfair to exercise jurisdiction over the Japanese corporation in light of the international context of the case, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum state. Id. at 116.

The Court stressed that the burden placed on the Japanese corporation was severe because it was commanded to traverse the distance between its foreign headquarters and to submit itself to a foreign nation's judicial system. Id. at 114 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."). In contrast, the interest of the plaintiff and California were comparatively slight—the only claim that remained was an indemnification claim based on a transaction that took place abroad and that involved the shipment of goods from Japan to Taiwan. Id. Moreover, "[b]ecause the plaintiff [was] not a California resident, California's interest in the dispute [was] considerably diminished." Id. The California Supreme Court had found that California "had an interest in 'protecting its consumers by ensuring that foreign manufacturers comply with the state's safety standards.'" Id. at 114 (citation omitted). But the Court held that this interest was overstated because it was "not at all clear . . . that California law should govern the question whether a Japanese corporation should indemnify a Taiwanese corporation on the basis of a sale made in Taiwan and a shipment of goods from Japan to Taiwan." Id. at 115 (citations omitted). In either event, the safety interest was protected so "long as those who use [the defendant's] components in their final products, and sell those products in California, are subject to the application of California tort law." Id.

Other circuit courts have since found that exercising jurisdiction over foreign defendants would be unreasonable under similar circumstances. For example, in Ellicott Machine Corp. v. John Holland Party Ltd., 995 F.2d 474, 475-76 (4th Cir. 1993), a Maryland corporation sought to bring a declaratory judgment action against an Australian construction and engineering company in a Maryland federal district court. The Fourth Circuit held that exercising jurisdiction over the Australian company would be inconsistent with traditional notions of fair play and substantial justice because litigating in Maryland would impose a heavy burden on the alien defendant. Id. at 480. Nearly all aspects of the underlying dispute in that case took place in Australia, witnesses to the dispute were located primarily in Australia, and the defendant would be forced to cross the globe to defend itself in a lengthy trial. Id. Moreover, the overwhelming Australian focus of the underlying contract implicated Australia's fundamental social policies. Id. While Maryland had an interest in adjudicating the action because the plaintiff was a Maryland resident, its interest was diminished because the disputed contract involved products intended for foreign consumption. Id. at 479.

Similarly, in Benton v. Cameco Corp., 375 F.3d 1070, 1079-80 (10th Cir. 2004), the Tenth Circuit held that due process was offended by the exercise of specific jurisdiction over a Canadian defendant in Colorado court even though the plaintiff was a Colorado resident and the defendant had sufficient minimum contacts with the forum. Because the defendant was a foreign corporation and Canadian law governed, the burden on the defendant was significant. Id. at 1079. Although Colorado and the plaintiff had an interest in the litigation being adjudicated in Colorado because the plaintiff was a Colorado resident, this factor did not weigh heavily in either parties' favor because Colorado law would not govern the parties' dispute. Id. Moreover, the judicial system's interest in efficient resolution of cases favored dismissal because many of the witnesses were

22

located in Canada, the allegedly injurious act occurred in Canada, and Canadian law governed the dispute. Id. at 1080.

Finally, in an analogous situation involving a domestic Delaware corporation, this court found it unreasonable for Texas to exercise jurisdiction even if the defendant's contacts with Texas were systematic and continuous. Bearry, 818 F.2d at 377. In Bearry, the court recognized that the burden placed on the domestic defendant was "real, certainly relatively so . . . ." Id. Furthermore, the "suit implicate[d] virtually no distinct interest of Texas." Id. The case arose from a plane crash that occurred in Mississippi and was brought by Louisiana residents on behalf of deceased Louisiana residents. Id. Any broad-based concerns that the defendant's products might lead to future injuries in Texas could be adequately protected by the exercise of specific jurisdiction if and when an injury occurred in Texas. Id. Nor did the plaintiffs have a distinct interest in the lawsuit proceeding in Texas because they were not Texas residents and they did not point to any witness or other evidence located in Texas. Id. Finally, the interests of the several states would not be served by adjudicating the case in Texas because both Kansas (the home of the defendant) and Mississippi (the locus of the injury) had stronger interests in the case. Id.

In the instant case, we find that exercising jurisdiction over MDS Canada would offend traditional notions of fair play and substantial justice. First, like the defendant in Asahi, a severe burden would be placed on MDS Canada if it is forced to defend itself in Texas. In addition to the regular burdens of defending oneself in a foreign legal system, MDS Canada would not have compulsory access to many of the witnesses and evidence necessary to defend itself. Cf. Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 874 (5th Cir. 1999) (holding that Texas was the most efficient forum because the vast majority of witnesses and other evidence were located in Texas). Second, "the procedural and substantive policies" of two other nations—Canada and Panama—would be

23

affected by the assertion of jurisdiction over MDS Canada. See Asahi, 480 U.S. at 115. Third, the judicial system's interest in an efficient resolution of the case favors litigating the case in Panama because MDS Canada has a potential third party claim for indemnification against the ION doctors and physicists. Cf. Guidry, 188 F.3d at 631 ("[T]he interstate judicial system's interests for the efficient resolution of controversies preponderates in favor of a single litigation inclusive of all defendants whose allegedly intentional and tortious acts have coalesced to injure the plaintiffs."); Ruston Gas Turbines, Inc., 9 F.3d at 421 (holding that it would be fair to exercise jurisdiction over the third-party defendant in Texas because the Texas forum would bring all the parties into one courtroom for a single resolution of the case).

None of these factors is outweighed by an interest of Texas or Plaintiffs. First, the only manner in which Texas could be conceivably viewed as a more convenient forum than Panama is if we focus on the six Plaintiffs who reside in the United States. But more than two hundred remaining plaintiffs reside in Panama. Taken as a whole, Plaintiffs cannot establish that it would be more convenient for them to litigate this case in Texas.

Second, Texas has, at most, a minimal interest in adjudicating the dispute. None of the injured Plaintiffs was a Texas resident, MDS Canada's allegedly tortious acts did not take place in Texas, Plaintiffs' injuries did not occur in Texas, and Texas law does not govern the dispute. See Reich v. Signal Oil & Gas Co., 409 F. Supp. 846, 851 (S.D. Tex. 1974) (recognizing that Texas has no special interest in granting relief to its citizens against a foreign corporation on a cause of action that arose under the laws of a foreign government for conduct outside the United States), cited with approval in Jones v. Petty-Ray Geophysical, Geosource, Inc., 954 F.2d 1061, 1070 (5th Cir. 1992). Plaintiffs argue that Texas has an interest in this dispute because: (1) the doctors from M.D. Anderson who investigated the events underlying this dispute reside in Texas; and (2) MDS

Canada sells radiation devices similar to the one used at ION to Texas customers. We do not agree that M.D. Anderson's after-the-fact investigation vests Texas with any real interest in this case. And while MDS Canada sells products in Texas, that interest is not substantial enough to overcome the burden placed on MDS Canada. See Bearry, 818 F.2d at 377 (holding that Texas' interest in the safety of products sold in Texas could be vindicated without exercising jurisdiction over the defendant).

In sum, we do not believe that MDS Canada has sufficient substantial, continuous, and systematic contacts with Texas to justify the exertion of general jurisdiction. MDS Canada does not maintain any office or other permanent presence in Texas. And the volume of MDS Canada's business in Texas is not so substantial that it should have reasonably expected to be haled into Texas court on any matter whatsoever. But even if MDS Canada's contacts were sufficient, it would offend traditional notions of fair play and substantial justice to exercise jurisdiction over MDS Canada in this case. In light of the international context of the case, the slight interests of both Plaintiffs and Texas, it is unreasonable to impose the heavy burden of defending this case in Texas on MDS Canada. See Asahi, 480 U.S. at 116.

III.

For the reasons stated above, we REVERSE the district court's April 30, 2007, order and REMAND with instructions to dismiss the case without prejudice. Plaintiffs shall bear the costs of this appeal.